UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| CRANPARK, INC., | ) | CASE No. 4:04CV1817 |
| | ) | |
| Plaintiff, | ) | MAGISTRATE JUDGE |
| | ) | GEORGE J. LIMBERT |
| v. | ) | |
| | ) | |
| ROGERS GROUP, INC., | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| Defendant. | ) | |

The above-captioned case is before the Court on Defendant Rogers Group, Inc.'s ("Defendant" or "RGI") Motion for Summary Judgment. ECF Dkt. #122. The instant matter involves diversity claims by Plaintiff for breach of contract (Count I) and for promissory estoppel (Count II). ECF Dkt. #1. Defendant seeks summary judgment on Counts I and II. For the following reasons, the Court GRANTS Defendant's motion and enters judgment in favor of Defendant on both Counts I and II:

I.      JURISDICTION

This case involves an alleged breach of a purported contractual agreement between Hardrives Paving & Construction, Inc. ("Hardrives") and Defendant. Plaintiff sues as a successor in interest to Hardrives. ECF Dkt. #1 at ¶1.

Diversity jurisdiction is appropriate pursuant to 28 U.S.C. § 1332 because: Plaintiff Cranpark, Inc. is a business that was duly organized and existed under the laws of the State of Ohio and had a principal place of business at 3550 Union Street, Mineral Ridge, Ohio, 44440; Defendant is a corporation organized under the laws of the state of Indiana, with a principal place of business at 421 Great Circle Road, Nashville, Tennessee, 37228; and the amount in controversy exceeds $75,000. ECF Dkt. #1 at ¶¶1-3, #14 at ¶¶1-2, 3.

Defendant initially contended that Plaintiff was not a successor in interest to Hardrives and that Plaintiff was not a real party in interest in this case.  ECF Dkt.  #14 at ¶ 1. In its brief in support of its motion for summary judgment, Defendant concedes that Plaintiff is a successor in interest to Hardrives.  ECF Dkt. #122 at 11-13, citing James Sabatine Dep. (ECF Dkt. #122, Ex C; *see also* ECF Dkt. #125 Attach. #2 (hereinafter "Sabatine Dep.")).  Since Mr. Sabatine's deposition provides factual support for the proposition that Cranpark is a successor in interest to Hardrives' contract with Defendant, the Court finds that Plaintiff has standing to pursue its claim against Defendant.  *See* Sabatine Dep. at 8-18.

Defendant has also denied that the amount in controversy exceeds $75,000.  ECF Dkt. #14 at ¶2.  The Court finds that the jurisdictional element is satisfied because Plaintiff avers that it has suffered damages in the amount of $10,000,000 as a result of a breach of contract and a good-faith basis exists for that claim – at least for an amount in excess of $75,000.  ECF Dkt. #1 at 7.  The Sixth Circuit has held that jurisdiction fails only where a legal certainty exists that a claim is for less than $75,000.  *Kovacs v. Chesley*, 406 F.3d 393, 395  (6th Cir. 2005) citing *St. Paul Mercury Indemnity Co. v. Red Cab Co.*, 303 U.S. 283, 58 S.Ct. 586, 82 L.Ed. 845 (1938).  The *Kovacs* court held that a woman satisfied the amount in controversy requirement where: (1) the damages alleged amounted to $100,000; (2) there was a legal basis for her claim; and (3) there was "some chance" that she could recover the amount claimed.  *Kovacs*, 406 F.3d at 395.  The court explained that "ultimate loss on the merits, even if based on a legal argument that is clear from the outset, is not enough to preclude jurisdiction, where the claim is apparently in good faith."  *Id*.  In sum, "the test for whether the jurisdictional amount has been met considers whether the plaintiff can succeed on the merits in only a very superficial way."  *Id*. at 396.

Here, there is some chance that Plaintiff could recover because it has alleged a breach of contract, produced a writing, and alleged damages precipitating from the breach.  The law could permit recovery for the type of damages claimed in an amount exceeding $75,000, and the facts alleged can support those damages.  *See Kovacs*, 406 F.3d at 397.  Therefore, the amount in controversy is satisfied in this case and diversity jurisdiction exists.

## II.    SYNOPSIS OF THE FACTS

James Sabatine owned an asphalt paving company named Hardrives Paving and Construction, Inc.  ECF Dkt. #122 at 3; #125 at 4.  Hardrives was located in Mineral Ridge, Ohio.  *Id*.

RGI produces and distributes construction aggregate.  ECF Dkt. #122 at 3; #125 at 4.  At the time of the events of this case, RGI had a large surface limestone quarry near Sandusky, Ohio.  *Id*.  RGI shipped the aggregate by rail to three rail-to-truck distribution terminals.  *Id*.  In other words, the aggregate would be delivered by rail from the Sandusky quarry to the distribution center, where it was loaded onto trucks.  *Id*.  Plaintiff contends that RGI had another site in Macedonia, Ohio, which had only truck-to-truck service, and aggregate had to be trucked in from Sandusky at a higher cost than if it could be shipped by rail.  ECF Dkt. #125 at 4-5.  This assertion is important because the Plaintiff ultimately contends that Defendant breached a purported agreement in favor of obtaining rail access at its Macedonia site.  *See* ECF Dkt. #125 at 15-18.  The parties agree that RGI had no presence in the Youngstown area.  ECF Dkt. #122 at 3; #125 at 5.

The parties disagree as to when they first discussed any prospective deal.  *See* ECF Dkt. #122 at 4; #125 at 6.  They do agree that Hardrives president James Sabatine and RGI Sales representative Tom Stump met with each other at a Flexible Pavements convention in Columbus, Ohio in March, 1998.  *Id*.  Mr. Sabatine and Mr. Stump discussed the possibility of shipping aggregate to Hardrives in the Youngstown region.  *Id*.

Plaintiff contends that the Mr. Sabatine and Mr. Stump then attended a dinner meeting to further discuss the idea.  ECF Dkt. #125 at 6.  Plaintiff contends that Mr. Stump's colleague, Brian Petit, and Mr. Sabatine's business associate, Tom Petraca, also attended the dinner.  *Id.*  Plaintiff contends that the four men discussed logistics and potential of establishing a rail-supplied aggregate distribution terminal and asphalt plant in the Youngstown area.  *Id*. at 6-7.  Plaintiff contends that the meeting was quite productive and that Mr. Stump was anxious to have more substantial conversations with Mr. Sabatine.  *Id*. at 7.

Plaintiff contends that "Stump was the point man for RGI on the development of the partnership with Hardrives."  ECF Dkt. #125 at 7 citing Stump. Dep. at p. 65, l. 1-3.  Mr. Stump

-3-

actually testified that he was the point man on the "project" with Hardrives. *See* Thomas Stump Dep. (ECF Dkt. #125, Attach #4 (hereinafter "Stump Dep.")) at p. 65, l. 1-3. Defendant admits that Mr. Stump met with Mr. Sabatine on several occasions after the trade show. ECF Dkt. #122 at 4.

The parties agree that Mr. Stump and Mr. Sabatine subsequently discussed economics, rail access, potential sites, and rail rates. ECF Dkt. #122 at 4-5; #125 at 7-9. The parties further agree that on September 1, 1998, Mr. Sabatine and Greg Gould met. ECF Dkt. #122 at 6; #125 at 9. At that time, Greg Gould was the vice president and general manager for northern Ohio for Rogers Group. Gregory Gould Dep. (ECF Dkt. #125 Attach. #3 (hereinafter "Gould Dep.")) at p. 9 l. 25 - p. 10 l. 3. During the meeting, Mr. Sabatine signed a document on behalf of Hardrives and Mr. Gould signed a document on behalf of RGI. *Id.* Plaintiff characterizes this document as a contract. ECF Dkt. #125 at 9. Defendant characterizes the document as an incomplete and conditional writing. ECF Dkt. #122 at 6. The September 1, 1998 writing is roughly reproduced, as follows:

This  agreement is between Hardrives
Paving + Const Inc and the Rodgers [sic] Group.

9/1/98

@ 4.00 or less total rai [sic]
include's [sic] cars

| #8 | – | 8.50 |
| #57 | – | 8.50 |
| #9 | – | 7.50 |
| sand | – | 7.50 |
| #304 | – | 7.50 |

↓

minimum 210k tons

SUBJECT TO RGI SR. MGT. APPROVAL
.50¢ Royalty on all non-Hardrives Sales
Free land     5 yr min tax abate.
No improve to rail included.

ECF Dkt. #122, Ex. 1[1] ("September 1, 1998 writing").

---

[1] Since the contract is handwritten, the Court previously misread the phrase "Free land. . ." as "Free 1 and 5 yr min tax abate." Upon review of the parties' briefs, the Court takes notice that the contract reads "Free land     5 yr min tax abate." ECF Dkt. #122 at 6, 125 at 22. The Court also omitted the word 'cars' from the phrase "include's cars." The Court notes that these errors were not material to its analysis on Plaintiff's motion  to compel discovery and for sanctions. ECF Dkt.

Defendant contends that neither Mr. Gould nor Mr. Stump remember the phrase "This agreement is between Hardrives Paving + Const Inc and the Rodgers [sic] Group" being on the document when the writing was made.  ECF Dkt. #122 at 6-7.

The parties go on to discuss the events occurring after they signed the September 1, 1998 writing.  *See* ECF Dkt. # 122 at 8 -9; #125 at 10-13.  While they essentially agree that representatives from RGI and Hardrives interacted, the parties characterize those interactions differently.  Plaintiff contends that the parties began working toward fulfilling the terms of "the agreement."  *See* ECF Dkt. #125 at 10 - 13.  Defendant contends that the parties continued their "preliminary negotiations."  ECF Dkt. #122 at 8-9.

Defendant asserts that Mr. Sabatine ordered a $1,500,000.00 asphalt plant on December 15, 1998 and began entering bids on prices set forth in the September 1, 1998 writing.  ECF Dkt. #125 at 13.

The parties agree that Mr. Stump and Mr. Sabatine met in February of 1999.  ECF Dkt. #122 at 10; #125 at 13-14.  Plaintiff contends that Mr. Stump advised Mr. Sabatine that RGI was walking away from the deal  ECF Dkt. #125 at 14.  Defendant acknowledges that Mr. Stump provided Mr. Sabatine with higher quotes than the September 1, 1998 writing set forth.  ECF Dkt. #122 at 10.

The parties agree that Mr. Sabatine sent Mr. Gould a letter on March 9, 1999 requesting a material quote.  ECF Dkt. #122 at 10; #125 at 14.  The parties further agree that Mr. Gould responded by letter on March 11, 1999, stating that the September 1, 1998 writing was not a contract.  ECF Dkt. #122 at 11; #125 at 14.  Mr. Sabatine responded with a letter dated April 27, 1999, stating that Hardrives would suffer lost revenue due to RGI backing out of the "agreed upon deal".  ECF Dkt. #122 at 10, Ex. 10; #125 at 14-15.  On October 30, 2000, Samuel Rapczak, RGI's senior vice president of the central region sent a letter to Mr. Sabatine reaffirming that RGI "is not interested in the Center street project, and [has] no contractual obligation. . ."  ECF Dkt. #125, Ex. 30.

---

#119.  Therefore, the Court takes this occasion to note that the errors did not affect its earlier ruling.

Plaintiff contends that it later discovered that Defendant breached the agreement because "RGI decided to ditch the Hardrives deal and negotiate a separate deal with Norfolk Southern for rail access to RGI's Macedonia distribution terminal." ECF Dkt. #125 at 17-18.

Defendant notes that Hardrives eventually took possession of the asphalt plant that it ordered on December 15, 1998. ECF Dkt. #122 at 11. Defendant notes that Hardrives thereafter sold the plant, and Cranpark became the successor to what was left of Hardrives. *Id*. at 12. Defendant contends that Cranpark sued Cederapids for various claims related to the manufacture of the asphalt plant and that the allegations regarding causation and damages were similar to the allegations in this case. *Id*.

### III.    PERTINENT PROCEDURAL HISTORY

On September 8, 2004, Plaintiff filed the instant suit as Hardrives' successor in interest. ECF Dkt. #1. The complaint alleges claims of breach of contract (Count I) and promissory estoppel (Count II). *Id*.

On February 8, 2010, Defendant filed the instant motion, seeking summary judgment on both counts of the complaint. ECF Dkt. #122. On March 10, 2010, Plaintiff filed a brief in opposition. ECF Dkt. #125. On March 24, 2010, Defendant filed a reply. ECF Dkt. #128.

This matter is scheduled for a jury trial on August 30, 2010. ECF Dkt. ##129, 130.

### IV.    STANDARD OF REVIEW

The function of summary judgment is to dispose of claims without trial when one party is unable to demonstrate the existence of a factual dispute which, if present, would require resolution by a jury or other trier of fact. *Schultz v. Newsweek, Inc.*, 668 F.2d 911, 918 (6th Cir. 1982). Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(C).

The party moving for summary judgment has the burden of showing there exists no genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). This burden can be discharged by showing that the nonmoving party has failed to establish an

essential element of his case, for which he bears the ultimate burden of proof at trial.  *See e.g.,* *Catrett v. Celotex Corp.*, 477 U.S. 317, 323 (1986); *Morales v. Am. Honda Motor Co., Inc.,* 71 F.3d 531, 535 (6th Cir. 1995).  The evidence and all the inferences that can reasonably be drawn therefrom must be read in the light most favorable to the nonmoving party.  *Id.*

If the moving party meets his burden, the nonmoving party must take affirmative steps to avoid the entry of a summary judgment.  *See* Fed. R. Civ. P. 56(e).  To refute such a showing, the nonmoving party must present some significant, probative evidence indicating the necessity of a trial for resolving a material, factual dispute. *Celotex*, 477 U.S. at 322.  A mere scintilla of evidence is not enough.  *Anderson v. Liberty Lobby*, 477 U.S. 242, 252 (1986).

In ruling on a motion for summary judgment, the court is not obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim. *Interroyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989).  Therefore, in determining whether a genuine issue of material fact exists on a particular issue, a court is entitled to rely only upon those portions of the record specifically called to its attention by the parties.  *Staats v. United States*, No. C-3-99-174, 2001 WL 1135056, *3 (S.D. Ohio Mar. 12, 2001), unreported; *Interroyal Corp. v. Sponseller*, 889 F .2d 108, 111 (6th Cir. 1989), *cert. denied*, 494 U.S. 1091 (1990).

## V.      LAW AND ANALYSIS

Defendant contends that it is entitled to summary judgment on Plaintiff's breach of contract and promissory estoppel claims because: (1) there is no enforceable contract in this case; (2) if there were a contract, Plaintiff's breach of contract claim would be barred by the Ohio Uniform Commercial Code;  and (3) there was no clear and unambiguous promise and Plaintiff's purported reliance on Defendant's representations was unreasonable.  ECF Dkt. #122.  The Court finds that genuine issues of material fact exist as to whether a meeting of the minds occurred and whether conditions related to the purported contract were satisfied.  Therefore, summary judgment cannot be entered on the basis that no enforceable contract was in place.  However, the Court also finds that the September 1, 1998 writing is governed by the Ohio Uniform Commercial Code and Plaintiff's breach of contract claim is barred by the 4-year statute of limitations.  Accordingly, summary judgment is appropriate on Count I (breach of contract).  Lastly, the Court finds that the writing and

the evidence presented do not establish that Plaintiff made a clear and unambiguous promise upon which Plaintiff could reasonably rely.  Therefore, summary judgment is appropriate on Count II (promissory estoppel) as well.

### A.    Review of Ohio Contract Law

The writing at issue in this case does not include a choice of law provision.  *See* ECF Dkt. #122, Ex. 1.  It is undisputed that the place of contracting, performance, and subject matter of the contract was in Ohio.  Therefore, Ohio law applies.  *See Spengler v. ADT Sec. Services, Inc.*, 505 F.3d 456, 457 (6th Cir. 2007) citing  Restatement (Second) of Conflict of Laws, § 188(2) (1971).

The Court looks to recent Sixth Circuit precedent for a summary of the general principles of Ohio contract law:

> Under Ohio law, the interpretation of written contract terms, including the determination of whether those terms are ambiguous, is a matter of law for initial determination by the court. *Parrett v. Am. Ship Bldg. Co.*, 990 F.2d 854, 858 (6th Cir.1993) (applying Ohio law); *Potti v. Duramed Pharmaceuticals, Inc.*, 938 F.2d 641, 647 (6th Cir.1991) (applying Ohio law); *see also Inland Refuse Transfer Co. v. Browning-Ferris Indus. of Ohio, Inc.*, 15 Ohio St.3d 321, 474 N.E.2d 271, 272-73 (1984) ("If a contract is clear and unambiguous, then its interpretation is a matter of law and there is no issue of fact to be determined. However, if a term cannot be determined from the four corners of a contract, factual determination of intent or reasonableness may be necessary to supply the missing term."). "The role of courts in examining contracts is to ascertain the intent of the parties." *City of St. Marys v. Auglaize Cty. Bd. of Commrs.*, 115 Ohio St.3d 387, 875 N.E.2d 561, 566 (2007). "The intent of the parties is presumed to reside in the language they choose to use in their agreement." *Graham v. Drydock Coal Co.*, 76 Ohio St.3d 311, 667 N.E.2d 949, 952 (1996); *accord State ex. rel Petro v. R.J. Reynolds Tobacco Co.*, 104 Ohio St.3d 559, 820 N.E.2d 910, 915 (2004). "Where the terms in a contract are not ambiguous, courts are constrained to apply the plain language of the contract." *City of St. Marys*, 875 N.E.2d at 566; *accord Alexander v. Buckeye Pipe Line Co.*, 53 Ohio St.2d 241, 374 N.E.2d 146, 150 (1978) ("[W]here the terms in an existing contract are clear and unambiguous, this court cannot in effect create a new contract by finding an intent not expressed in the clear language employed by the parties."). However, "[e]xtrinsic evidence is admissible to ascertain the intent of the parties when the contract is unclear or ambiguous, or when circumstances surrounding the agreement give the plain language special meaning." *Graham*, 667 N.E.2d at 952; *accord R.J. Reynolds*, 820 N.E.2d at 915. Nevertheless, a court "is not permitted to alter a lawful contract by imputing an intent contrary to that expressed by the parties" in the terms of their written contract. *Westfield Ins. Co. v. Galatis*, 100 Ohio St.3d 216, 797 N.E.2d 1256, 1261-62 (2003).
>
> Contractual language is ambiguous "only where its meaning cannot be determined from the four corners of the agreement or where the language is susceptible of two or more reasonable interpretations." *Covington v. Lucia*, 151 Ohio App.3d 409, 784 N.E.2d 186, 190 (2003) (quoting *Potti*, 938 F.2d at 647); *see also King v. Nationwide Ins. Co.*, 35 Ohio St.3d 208, 519 N.E.2d 1380, 1383 (1988); *United States Fid. & Guar. Co. v. St. Elizabeth Med. Ctr.*, 129 Ohio App.3d 45, 716 N.E.2d 1201, 1208

-8-

(1998). "[C]ourts may not use extrinsic evidence to create an ambiguity; rather, the ambiguity must be patent, i.e., apparent on the face of the contract." *Covington*, 784 N.E.2d at 190. In determining whether contractual language is ambiguous, the contract "must be construed as a whole," *Tri-State Group, Inc. v. Ohio Edison Co.*, 151 Ohio App.3d 1, 782 N.E.2d 1240, 1246 (2002) (*quoting Equitable Life Ins. Co. of Iowa v. Gerwick*, 50 Ohio App. 277, 197 N.E. 923, 926 (1934)), so as "to give reasonable effect to every provision in the agreement." *Stone v. Nat'l City Bank*, 106 Ohio App.3d 212, 665 N.E.2d 746, 752 (1995); *see also Burris v. Grange Mut. Co.*, 46 Ohio St.3d 84, 545 N.E.2d 83, 88 (1989) ("The meaning of a contract is to be gathered from a consideration of all its parts, and no provision is to be wholly disregarded as inconsistent with other provisions unless no other reasonable construction is possible." (*quoting Karabin v. State Auto. Mut. Ins. Co.*, 10 Ohio St.3d 163, 462 N.E.2d 403, 406 (1984))). "[C]ommon words appearing in the written instrument are to be given their plain and ordinary meaning unless manifest absurdity results or unless some other meaning is clearly intended from the face or overall contents of the instrument." *Alexander*, 374 N.E.2d at 150.

If the language in the contract is ambiguous, the court should generally construe it against the drafter. *See Central Realty Co. v. Clutter*, 62 Ohio St.2d 411, 406 N.E.2d 515, 517 (1980); *Mead Corp. v. ABB Power Generation, Inc.*, 319 F.3d 790, 798 (6th Cir.2003) (applying Ohio law). In particular, "where the written contract is standardized and between parties of unequal bargaining power, an ambiguity in the writing will be interpreted strictly against the drafter and in favor of the non-drafting party." *Westfield*, 797 N.E.2d at 1261. However, this contra proferentem rule does not allow a court to adopt an unreasonable interpretation of the contract. *Id*. (*citing Morfoot v. Stake*, 174 Ohio St. 506, 190 N.E.2d 573, 574 (1963)). Indeed, the purpose of the contra proferentem rule is to provide a means of determining which of two reasonable contractual interpretations should control. *See* Restatement (Second) of Contracts § 206 (1981) ("In choosing among the reasonable meanings of a promise or agreement or a term thereof, that meaning is generally preferred which operates against the party who supplies the words or from whom a writing otherwise proceeds." (emphasis added)).

If the contract is silent, as opposed to ambiguous, with respect to a particular matter, *see Statler Arms, Inc. v. APCOA, Inc.*, 92 Ohio Misc.2d 45, 700 N.E.2d 415, 421 (1997) ("The fact that a contract ... is silent on a particular point does not make it ambiguous."), "it is not the function of courts in Ohio to formulate a new contract for the parties." *Fultz & Thatcher v. Burrows Group Corp.*, No. CA2005-11-126, 2006 WL 3833971, at *6 (Ohio Ct.App. Dec. 28, 2006) (unpublished) (citing *Aultman Hosp. Ass'n v. Comm. Mut. Ins. Co.*, 46 Ohio St.3d 51, 544 N.E.2d 920, 924 (1989)). Rather, "[t]he parties to a contract are required to use good faith to fill the gap of a silent contract." *Burlington Res. Oil & Gas Co. v. Cox*, 133 Ohio App.3d 543, 729 N.E.2d 398, 401 (1999); *accord Myers v. Evergreen Land Dev. Ltd.*, No. 07 MA 123, 2008 WL 650774, at *5 (Ohio Ct.App. Mar. 6, 2008) (unpublished) ("An obligation of good faith generally arises only where a matter was not resolved explicitly by the parties.... [T]his duty is implied only under limited circumstances, such as when the contract is silent as to an issue. In such a case, the parties must use good faith in filling the gap."). " 'Good faith' is a compact reference to an implied undertaking not to take opportunistic advantage in a way that could not have been contemplated at the time of drafting, and which therefore was not resolved explicitly by the parties." *Ed Schory & Sons, Inc. v. Soc. Nat'l Bank*, 75 Ohio St.3d 433, 662 N.E.2d 1074, 1082-83 (1996) (*quoting Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting*, 908 F.2d 1351, 1357-58 (7th Cir.1990)). "What the duty of good faith consists of depends upon the language of the contract in each case which leads to an evaluation of reasonable expectations of the parties." *Fultz & Thatcher*, 2006 WL 3833971, at *6.

-9-

*Savedoff v. Access Group, Inc.*, 524 F.3d 754, 763-64 (6th Cir. 2008).

In Ohio, the fundamental elements of a breach of contract claim include: (1) the existence of a contract; (2) performance by the plaintiff; (3) breach by the defendant; and (4) damage or loss to the plaintiff as a result of the breach.  *Savedoff,* 524 F.3d at762 (as to duty, breach, and damages); *Telxon Corp. v. Smart Media of Delaware, Inc.*, 2005 WL 2292800 at *37 (Ohio  App. 9 Dist. Sept. 21, 2005), unreported (as to causation); *Metropolitan Life Ins. Co. v. Triskett Illinois, Inc.*, 646 N.E.2d 528, 533 (Ohio App. 1st Dist 1994) (as to causation).

**B.**      **COUNT I: Contract Claim Analysis**

**i.**      **Summary of Analysis**

Defendant argues that Plaintiff's breach-of-contract claim should fail because there was no meeting of the minds.  ECF Dkt. #122 at 15-18.  Defendant reasons that the conduct of the parties evidences only preliminary discussions and negotiations.  *Id*. at 17.  Specifically, Defendant contends that:

> The parties' preliminary discussions never reached a formal contract here. The conduct
> Sabatine contends is evidence of an implied contract is nothing more than enthusiastic negotiations. So it makes no difference if the parties worked hard, negotiated with railroads, rented jets, or attended meetings in different cities if, in the end, those negotiations and meetings did not result in a meeting of the minds.
>
>          *      *      *
>
> The prices contained in the September 1 writing also represent nothing more than preliminary negotiations. Merely because Sabatine subjectively thought this writing was an enforceable contract does not make it so. Instead, "the binding force of [a] document depends on public or shared expressions." *See Skycom Corp. v. Telstar Corp., 813 F.2d 810, 814-15* (7th Cir.1987) (finding a letter containing conditional terms was not an enforceable contract; "secret hopes and wishes count for nothing").
>
>          *      *      *
>
> Gould testified that RGI—a sophisticated business entity—would never agree to terms written as part of a "napkin contract" and that Sabatine was aware that RGI required a formally executed contract. Gould dep. at 69, Exh. B."

ECF Dkt. #122 at 17-19. Defendant further contends that "It is well established that when parties anticipate a formal, definitive contract and that contract is never formalized, the parties' earlier oral representations do not create an enforceable contract. " ECF Dkt. #122 at 19.  The Court disagrees with that conclusion.  As one Ohio court explained:

-10-

Appellant contends, however, that appellee has failed to produce any agreement signed by the parties, thereby evincing that no agreement was ever reached. However, "[p]arties to a contract may be bound by their oral agreements although they contemplate executing a final written agreement containing all of the provisions upon which they agreed." *Cleveland School District v. Cleveland Teachers Union* (1980), 68 Ohio App.2d 118, 124, 427 N.E.2d 540 (Patton, J., concurring.) *See, also, Ciaramella v. Reader's Digest Assn., Inc.* (C.A.2, 1997), 131 F.3d 320, 322 ("parties are free to bind themselves orally, and the fact that they contemplate later memorializing their agreement in an executed document will not prevent them from being bound by the oral agreement"). Further, "[t]he question of whether the parties intended to be bound prior to the execution of the formal written contract is a question of intent and an issue of fact." *Cleveland School Dist., supra*, at 124, 427 N.E.2d 540.

*Dehoff v. Veterinary Hosp. Operations of Cent. Ohio, Inc.*, No. 02AP-454, 2003 WL 21470388 at *9 (Ohio App. 10 Dist., June 26, 2003).

In this case, however, a written document exists, and the parties' intent is presumed to reside in that document. *See Graham*, 667 N.E.2d 949, 952. Therefore, the Court must first examine the writing to determine if a meeting of the minds occurred. Defendant has failed to show that no genuine issues of material fact exist pertaining to the parties' intent in signing the September 1, 1998 writing because the document contains the essential terms of an agreement to sell goods and because it presents ambiguities related to conditions precedent. *See Alligood v. Procter & Gamble Co.*, 594 N.E.2d 668, 669 (Ohio App. 1 Dist.,1991) ("[a] valid contract must also be specific as to its essential terms, such as the identity of the parties to be bound, the subject matter of the contract, consideration, a quantity term, and a price term."). Therefore, genuine issues of material fact exist and the Court cannot enter summary judgment on the basis that no meeting of the minds occurred.

Since the September 1, 1998 writing contains essential terms of a contract, it is largely immaterial how Defendant normally transacts its business, absent an express condition in the writing. The only clear condition was that the agreement was subject to RGI senior management approval. As discussed below, the presence of that condition determines that there was no meeting of the minds when the parties signed the agreement. However, an officer, such as Mr. Gould, has the authority to bind a company to exercise good faith in considering an offer or a conditioned writing where the company has direct influence over the fulfillment of a condition precedent. *See Johnston v. Cochran*, 2007 WL 2421821 at *3 (Ohio App. 10 Dist. Aug. 28, 2007), unreported; *Kebe v. Nutro Mach. Corp.* 507 N.E.2d 369, 373 (Ohio App. 8th Dist. 1985); *Hollingsworth v.*

-11-

*Range Resources-Appalachia, LLC*, No. 3:09cv838, 2009 WL 3601586 at *1, *10 (M.D.Pa., Oct. 28, 2009) slip op., *discussed infra*.  As discussed below, there is no evidence before this Court that RGI senior management ever considered approving the September 1, 1998 writing.  Therefore, the senior management approval condition does not necessitate summary judgment.

Aside from the contractual language requiring senior management approval, the only evidence upon which Defendant relies to demonstrate that Plaintiff would know that RGI did not finalize deals on a napkin is Mr. Gould's own deposition testimony. ECF Dkt. #122 at 17-19 citing Gould Dep. at 69-70; *See Comfort Trane Air Conditioning Co. v. Trane Co.*, 592 F.2d 1373, 1383 (5th Cir.1979) ("Unsupported, self-serving testimony is not substantial evidence sufficient to create a jury question.") cited with approval in *Brooks v. American Broadcasting Companies, Inc.*, 999 F.2d 167 (6th Cir. 1993) (Mr. Gould's testimony is self-serving for RGI because he is the Federal Rule of Civil Procedure 30(b)(6) representative).  Irrespective of RGI's internal policies, when representatives of Hardrives and RGI signed a document containing essential terms, objective evidence can support a reasonable finding that a contract had been formed.

Although Defendant generally contends that the evidence in this case falls short of demonstrating an intention to contract, Defendant has not made a factually specific showing that a reasonable interpretation of the writing and, if necessary extrinsic evidence of the parties' intent, would permit but one result – that no meeting of the minds occurred.  In fact, Defendant contends that the proposal was conditioned on obtaining a particular parcel of land and on obtaining rail access.  *See* ECF Dkt. #122 at 18; 128 at 6.  Neither of those terms appear clearly and unambiguously in the September 1, 1998 writing.  Therefore, genuine issues of material fact exist pertaining to the issue of whether a meeting of the minds occurred.

Defendant also contends that the September 1, 1998 writing is governed by the Ohio Uniform Commercial Code ("UCC"), which provides that a four year statute of limitations applies to claims based upon contracts for the sale of goods.  ECF Dkt. #122 at 22-26 citing O.R.C. § 1302.98(A).  The Court finds this argument to be compelling because the predominant purpose of the September 1, 1998 writing was to enable the sale of goods to Plaintiff.  Thus, the four year statute of limitations applies.  Plaintiff filed the instant suit more than four years after the breach of

-12-

contract claim accrued.  Therefore, Plaintiff's claim is time-barred and summary judgment is appropriate.

### ii.      Essential terms

The Court finds that Defendant has failed to demonstrate that all of the evidence, construed in the light most favorable to Plaintiff, could not establish that a meeting of the minds has occurred. *See Telxon*, 2005 WL 2292800 at *15 (as to standard of review).

Defendant's opening brief contends that:

> Viewed objectively, no meeting of the minds ever occurred as to essential terms, nor were those terms sufficiently definite to be enforceable. On the contrary, the parties worked — and worked hard — toward an enforceable contract that did not come to fruition. And an indefinite, conditional writing only confirmed that there was no meeting of the minds or mutual assent necessary to form an enforceable contract.

ECF Dkt. #122 at 15.  Defendant's argument fails to acknowledge that two representatives with at least apparent authority endorsed the September 1, 1998 writing and the writing identified the subject matter, prices, term, and a quantity.

"To prove the existence of a contract, a party must establish the essential elements of a contract: an offer, an acceptance, a meeting of the minds, an exchange of consideration, and certainty as to the essential terms of the contract." *Juhasz v. Costanzo*, 761 N.E.2d 679, 684 (Ohio App. 7 Dist.,2001).  Further, "[a] valid contract must also be specific as to its essential terms, such as the identity of the parties to be bound, the subject matter of the contract, consideration, a quantity term, and a price term." *Alligood v. Procter & Gamble Co.*, 594 N.E.2d 668, 669 (Ohio App. 1 Dist.,1991).  Contrary to Defendant's assertion, the essential terms are present in the September 1, 1998 writing.

Here, the identities of the parties are not in dispute, both Plaintiff and Defendant acknowledge that James Sabatine executed the document on behalf of Hardrives and Greg Gould executed the document on behalf of RGI.  Sabatine Dep. at p. 40, l. 13-16; Stump Dep. at p. 121, l. 5-7, p. 122, l. 17-21; Gould Dep. at p.68, l. 2-8.  The consideration is a promise to buy and a promise to sell aggregate; however, Defendant contends that the writing was a "concept with contingencies."  The Court acknowledges that at least one condition attached to the terms of the September 1, 1998 writing, but if that condition were satisfied, then Defendant could have been

-13-

bound to fulfill a promise to sell aggregate.  Thus, a concept with contingencies is nothing more than a conditional offer, which will be discussed further below.[2]  ECF Dkt. #122, Ex. 1.   The subject matter and quantity of the purported agreement are identified as a minimum of 210,000 tons of various types aggregate, and the price is specified according to a schedule.  ECF Dkt. #122, Ex. 1.

Given the foregoing, the Court finds that the September 1, 1998 writing contains the essential terms that could be construed as necessary for a binding contract.

### iii.  Senior management approval language

Despite the foregoing finding that the writing contains essential terms, the Court acknowledges that many ambiguities exist in the September 1, 1998 writing.  Defendant contends that the writing at issue contains multiple conditions that were not fulfilled.  ECF Dkt. #122 at 19. The Court agrees that at least one condition exists that was not fulfilled – RGI senior management approval.  Plaintiff, however, views the writing as setting forth obligations, not as a conditioned promise.  *See* ECF Dkt. #125 at 22.  Plaintiff states that:

> [T]he terms of the contract were clearly and unambiguously set forth in the September 1, 1998 agreement:
>
> • Hardrives would purchase a minimum of 210,000 tons of the following types of aggregate per year at the following prices:
>
> | Aggregate Grade | Price Per Tonnage |
> | --- | --- |
> | #8 | $8.50/ton |
> | #57 | $8.50/ton |
> | #9 | $7.50/ton |
> | Sand | $7.50/ton |
> | #304 | $7.50/ton |
>
> • RGI would pay Hardrives a $0.50 per ton royalty on all non-Hardrives aggregate sales from the new distribution terminal.
>
> • Hardrives would secure land for its asphalt plant and RGI's adjacent distribution terminal at no cost to RGI.

---

[2]  To the extent that provisions of the contract can be construed as conditions, they had to be satisfied before promises became binding obligations.  *See Savage v. Am. Family Ins. Co.,* 178 Ohio App.3d 154, 897 N.E.2d 195, 200 (Ohio App. 10 Dist.,2008).  To the extent that these provisions could be construed as consideration, they would have no effect on whether a meeting of the minds occurred.  As discussed below, the Court ultimately determines that they are conditions based upon Mr. Sabatine's deposition testimony.  *See* Sabatine Dep. at p. 39, l. 20 - p. 40, l. 3.

-14-

- Hardrives would obtain a five-year-minimum property tax abatement from the City of Youngstown.

- Aggregate would be railed in by RGI at less than $4.00/ton and RGI would not be required to contribute to any rail improvements.

ECF Dkt. #125 at 22.  The September 1, 1998 writing simply is not as clear as Plaintiff makes it out to be.  In contrast to Plaintiff's representation, the handwritten document reads as follows:



ECF Dkt. #122, Ex. 1.  Conspicuously absent from Plaintiff's recitation is the language "SUBJECT TO RGI SR. MGT. APPROVAL".  *See* #125 at 22.  This omission alerts the Court to the presence of a condition that has not been satisfied.

"A condition is an event, not certain to occur, which must occur, unless its non-occurrence is excused, before performance under a contract becomes due." *Savage,* 897 N.E.2d at 200 quoting Restatement of the Law 2d, Contracts (1981) 160, Section 224; *see also Williston on Contracts* § 38:1 (4th ed.) ("If the condition is not fulfilled, the right to enforce the contract does not come into existence."). "While the failure to perform a promise is a breach of contract, the failure to satisfy a condition is not." *Morrison v. Bare*, No. 23667, N.E.2d, 2007 WL 4415307 (Ohio App. 9 Dist. Dec. 19, 2007), unreported.

The language "SUBJECT TO RGI SR. MGT. APPROVAL" clearly imposes a condition precedent. The adjective 'subject' is defined as follows: "contingent on or under the influence of some later action <the plan is subject to discussion>." *Merriam-Webster's Online Dictionary* (available at http://www.merriam-webster.com/dictionary/subject (entry for adjective)) (last visited April 1, 2010); *see Ross v. Harding* 391 P.2d 526, 531 ("It would be difficult to choose words to more precisely express an intention to create a condition precedent than those used in the contract here to be construed. 'It is specifically understood and agreed that this offer is made *subject* to the written consent * * *' ") (emphasis in original). Therefore, RGI senior management approval was an event not certain to occur because the approval of the document that Mr. Gould executed was contingent on an action by RGI senior management – it was a condition precedent.

A condition precedent is generally not a promise. *See Comprehensive Care Corp. v. RehabCare Corp.*, 98 F.3d 1063 (8th Cir., 1996); *see also Williston* § 38:15; *Merritt Hill Vineyards Inc. v. Windy Heights Vineyard, Inc.*, 460 N.E.2d 1077, 1081-82 (N.Y. 1984) ("While a contracting party's failure to fulfill a condition excuses performance by the other party whose performance is so conditioned, it is not, without an independent promise to perform the condition, a breach of contract subjecting the nonfulfilling party to liability for damages."). "Non-occurrence of a condition is not a breach by a party unless he is under a duty that the condition occur." *Morrison*, 2007 WL 4415307 at *5 quoting Restatement of the Law 2d, Contracts (1981) 160, Section 225 (3). Specifically, no meeting of the minds is considered to have occurred when a writing is conditioned upon management approval. *See Hollingsworth*, 2009 WL 3601586 at *10.

-17-

In this situation, however, the "SUBJECT TO RGI SR. MGT. APPROVAL" was wholly within Defendant's discretion.  Therefore, Defendant had an obligation to exercise good faith in fulfilling the condition. *See Johnston*, 2007 WL 2421821 at *3 quoting *Kebe v. Nutro Mach. Corp*. 507 N.E.2d at 373 ("When one of the parties to a contract has direct influence over the fulfillment of a condition precedent, that party bears 'the burden to show that it made good faith efforts to satisfy [the] contractual conditions which allegedly excuse its performance.' ").  In a situation involving senior management approval, the Court finds that good faith requires at least presenting the writing to senior management for consideration. *See Hollingsworth*,  2009 WL 3601586 at *1, *10 (affirming summary judgment where "Plaintiffs offered the oil and gas lease to Defendant and Defendant rejected the lease agreement when its senior management did not approve of it, and marked it 'Void.' ").  Defendant had a burden to prove its good faith efforts to this Court for the purposes of obtaining summary judgment. *See Johnston*, 2007 WL 2421821 at *3 .

Here, Defendant has not directed the Court to any evidence that the September 1, 1998 agreement was ever presented to RGI senior management.  Since no evidence of good faith was offered, a genuine issue of material fact exists as to whether the condition was fulfilled. Such a question is directly relevant to the issue of whether a meeting of the minds ever occurred. *See Hollingsworth*, 2009 WL 3601586 at *10 ("We find, as Defendant argued, that no contract was ever formed in this case since both parties did not show an intent to be bound unless the least offer of Plaintiffs was approved by Defendant's management. ").  And under Ohio law, if Defendant failed to exercise good faith or exercised bad faith with respect to obtaining senior management approval, then the existence of the condition would not prevent the jury from determining that a meeting of the minds had occurred. *See Johnston*, 2007 WL 2421821 at *3.

Of note, Defendant contends that the condition "SUBJECT TO RGI SR. MGT. APPROVAL" had to refer to someone other than Mr. Gould, and the Court agrees because Mr. Gould signed the September 1, 1998 document.  ECF Dkt. # 128 at 7.  This conclusion forecloses the possibility that Mr. Gould's own review of the document could satisfy the good faith requirement discussed above.

-18-

The foregoing conclusions would not prevent Defendant from presenting the issue of management approval to a jury, but of course Plaintiff will have the opportunity to challenge the showing of good faith through cross-examination and its own evidence. Thus, a trial on the merits would be necessary to determine if the failure of the condition prevents the parties from being bound.

As an additional matter, Plaintiff contends that a trial is necessary in order for a jury to interpret ambiguities related to the senior management approval language. ECF Dkt. #125 at 24-25. The Court finds that argument to lack merit.

The Court has the power to interpret the writing to determine if an ambiguity exists. *Parret*, 990 F.2d at 858. Generally, an ambiguity precludes summary judgment. *Id.* citing *Heheman v. E.W. Scripps Co.*, 661 F.2d 1115, 1128 (6th Cir.1981).

Although Plaintiff contends that the writing at issue sets forth clear terms, Plaintiff later takes the position that the writing contains an inconsistency:

> In his March 11, 1999 letter to Sabatine, and again at his deposition, Gould claimed that the "management approval" language in the middle of the contract meant that the entire agreement was subject to RGI senior management approval. Now, RGI argues that only the final pricing structure was subject to senior management approval. (RGI Motion for Summary Judgment at 19.) Which is it?
>
> Notwithstanding this clear discrepancy, it was Sabatine's understanding that Gould was "senior management" because he was "directing the whole operation" on behalf of RGI. (Sabatine Depo at 40:8-41:8.) As set forth below, the inconsistency on this issue further demonstrates that Summary Judgment is not warranted.

ECF Dkt. #125 at 24-25; *see also* ECF Dkt. # 125 at 22 ("the terms of the contract were clearly and unambiguously set forth in the September 1, 1998 agreement"). Plaintiff takes inconsistent positions in arguing that a contract exists because the writing sets forth clear and unambiguous terms, but also arguing that a jury trial is necessary because an ambiguity exists relating to the senior management provision.

Regardless of whether the management approval provision modifies the entire agreement or simply the pricing term, it is clear that the provision imposes a condition precedent because the plain language dictates that at least a portion of the agreement was "subject to" an event occurring that was uncertain to occur.

-19-

Plaintiff takes the position that evidence supports a finding that the condition was satisfied because Mr. Sabatine believed that Mr. Gould was senior management. ECF Dkt. #125 at 24-25. Plaintiff's argument is contrary to law because a party cannot use extrinsic evidence to create an ambiguity in a writing. *Tri-State Group*, 782 N.E.2d at 1246; *Equitable Life*, 197 N.E. at 926. There is no ambiguity because Plaintiff has admitted that Mr. Gould signed the writing (ECF Dkt. #125 at 9; Sabatine Dep. at p. 32, l. 7-25, p. 33, l. 1-9) and because the writing clearly indicates that it is subject to RGI senior management approval. ECF Dkt. #122, Ex. 1. Clearly, RGI senior managers beside Mr. Gould had to approve the agreement because there is no other reasonable explanation for Mr. Gould to execute a document that explicitly states "SUBJECT TO RGI SR. MGT. APPROVAL". Mr. Sabatine's deposition testimony cannot create an ambiguity that does not exist on the face of the instrument. Thus, the Court clarifies that it is not denying Defendant's motion on the basis that the phrase "SUBJECT TO RGI SR. MGT. APPROVAL" created an ambiguity.

### iv. Whether ambiguous provisions are conditions or promises

The Court now turns to the other provisions of the September 1, 1998 writing that could impose conditions: "@ 4.00 or less total rai [sic] include's [sic] cars," "Free land," "5 yr min tax abate," and "No improve to rail included." *See* ECF Dkt. #122, Ex. 1. These provisions do not contain the same clear language as the "SUBJECT TO RGI SR. MGT. APPROVAL" provision does. As the Supreme Court of Washington noted in *Ross*: "Any words which express, when properly interpreted, the idea that the performance of a promise is dependent on some other event will create a condition. Phrases and words such as 'on condition,' 'provided that,' 'so that,' 'when,' 'while,' 'after,' or 'as soon as' are often used." *Ross*, 391 P.2d at 237. The provisions in question here arguably contain no prefacing language at all. The Court notes that it could be inferred that all of these terms are conditions from the manner in which "subject to" is offset, which is roughly reproduced below:

SUBJECT TO RGI SR. MGT. APPROVAL
.50¢ Royalty on all non-Hardrive sales
Free land      5 yr min tax abate.
no improve to rail included

ECF Dkt. #122, Ex. 1.  It is not clear from the writing that the phrase "subject to" modifies ".50¢ Royalty on all non-Hardrive sales," "Free land," "5 yr min tax abate," and "no improve to rail included."  Notably, there is no colon following "subject to," the elements are not numbered or bulleted, the elements are not separated by commas or semicolons, and there is no conjunction connecting the elements.  Therefore, a reasonable jury could conclude that "SUBJECT TO" modifies only "RGI SR. MGT. APPROVAL" or that it modifies all four provisions.

The mere fact that it is questionable whether "subject to" modifies these provisions establishes an ambiguity as to whether they are conditions or promises.  For example, taken alone the phrase "Free land" can be considered either as a promise for Hardrives to provide free land to RGI or as a condition precedent underlying RGI's pricing schedule; the prices would only be valid if RGI could obtain free land.

Defendant's opening brief presumes that these written provisions are conditions.  ECF Dkt. #122 at 6.  Although, Defendant later directs the Court to deposition testimony where Mr. Sabatine acknowledged that the writing was contingent on free land, a 5 year tax abatement, and RGI not having to make any rail improvements.  ECF Dkt. #122 at 19 citing Sabatine Dep. at p. 39, l. 20-p.40, l. 3.  Plaintiff contends that these provisions are promises.  ECF Dkt. #125 at 22.  Neither party acknowledges that this writing is ambiguous with respect to whether "@ 4.00 or less total rai [sic] include's [sic] cars,"".50¢ Royalty on all non-Hardrive sales," "Free land," "5 yr min tax abate," and "No improve to rail included" are promises or conditions.  Consequently, the briefs cite no precedent from Ohio that controls when a provision is subject to reasonable interpretation as a promise and reasonable interpretation as a condition.  The Court is not aware of any controlling precedent for this particular legal situation.  However, the Court notes that other jurisdictions have held that "[w]here it is doubtful whether words create a 'promise' or an 'express condition,' they are interpreted as creating a 'promise.' "  *Ross*, 391 P.2d at 236 citing Restatement, Contracts § 261, p. 375; 5 Williston, Contracts (3d ed.) § 665, p. 133; *Sternberg v. Secretary, Dept. Of Health And Human*

*Services*, 299 F.3d 1201, n.5 (10th Cir. 2002).  While the Court acknowledges that these cases are not binding, the Court is unaware of an precedent compelling a finding that the terms in the September 1, 1998 writing are conditions.  Even if the rule of law in Ohio would not mandate a finding that the ambiguous terms are promises, the ambiguity must be submitted to the jury for a determination of the parties' intent.  *See Inland Refuse*, 474 N.E.2d at 272-73.

Given that the foregoing provisions are subject to more than one reasonable interpretation and that it is unclear whether Ohio law requires the ambiguous provisions to be interpreted as promises or submitted to a jury for determination of the parties' intent, the Court turns to the extrinsic evidence that has been presented to see if triable issues of fact exist.

Plaintiff contends that both parties had "the same understanding with respect to the terms of the September 1, 1998 contract."  ECF Dkt. #125 at 10.  Plaintiff then cites Mr. Sabatine's deposition at pages 34-40.  The Court notes that on pages 39 and 40, Mr. Sabatine specifically acknowledged that the provisions noted above were contingencies:

> Q.  Okay. So would it be fair to say then, these last three things that we've talked about, that Rogers Group's performance under this document was contingent on them getting free land, a five-year minimum tax abatement, and not having to install any rail improvements?
>
> A.  This is the way this agreement was negotiated at that time.
>
> Q.  Well, that, what I'm asking you – I understand that -- but I'm asking you, isn't it true that their performance under the terms here were contingent on free land, a five-year minimum tax abatement, and them not having to make any rail improvements?
>
> A.  That's what we discussed and that's what we put in writing.
>
> Q.  Okay.
>
> A.  That's what we initialed.

Sabatine Dep. at p. 39, l. 12 - p. 40 l. 3.  Although Mr. Sabatine's testimony touches on legal opinion, it provides direct evidence of his state of mind and intent to contract.  Based on Mr. Sabatine's testimony, he believed that there were contingencies.  Thus, it is undisputed that no binding agreement existed until the contingencies or conditions were fulfilled.

The question becomes twofold: (1) whether there are any ambiguities related to what the conditions required; and (2) whether there are any disputes of material fact as to whether the

-22-

conditions were satisfied.  These questions are intertwined to some extent because if an ambiguity exists in the condition, it could be unclear as a factual matter whether the condition has been satisfied.

As a preliminary matter, the Court notes that Defendant contends that there was no "certainty of terms" in the September 1, 1998 writing.  ECF Dkt. #122 at 18-20.  Most of the arguments that Defendant advances pertaining to uncertain terms are more appropriately characterized as challenging the writing for failing to satisfy conditions precedent.  It appears that Defendant's argument pertaining to uncertainty of terms does not challenge the writing for failing to state terms.  Thus, it does not deal with uncertainty pertaining to whether the writing contains the material terms of the purported agreement.  *See Eastbanc, Inc. v. Georgetown Park Associates II, L.P.*, 940 A.2d 996, 1002 (D.C.,2008) (discussing certainty).  Rather, Defendant's arguments pertain to the factual uncertainty as to whether certain conditions would be fulfilled in the future.  *See* ECF Dkt. #122 at 18 ("Many important uncertainties existed here, one of which was rail access.  Acquiring a site that had favorable rail access at no cost to RGI was an important uncertainty that had to be resolved before RGI would agree to supply aggregate stone at the prices discussed at the September 1 meeting.").  Therefore, Defendant's arguments are properly characterized as arguments pertaining to conditions precedent, not pertaining to uncertainty of terms.  The Court will proceed to consider if the provisions of the September 1, 1998 writing set forth conditions precedent and if there is a genuine issue of material fact as to whether those conditions were fulfilled.

### (a)    ".50¢ Royalty on all non-Hardrive sales"

Although a structural ambiguity exists as to whether "subject to"  modifies ".50¢ Royalty on all non-Hardrive sales," the Court finds that the provision can only reasonably be construed as a promise.  It simply does not make sense to consider the provision ".50¢ Royalty on all non-Hardrive sales" as a condition precedent because it is not an event uncertain to occur.  *See Savage,* 897 N.E.2d at 200.  It is clearly bargained-for consideration.  Accordingly, the Court finds no genuine issue of material fact pertaining to this term.

**(b)** **"5 yr min. tax abate."**

The five year tax abatement must be construed as a condition  precedent because it had to be obtained from a third party, not Hardrives or RGI.  Contrary to Plaintiff's representation, the writing does not unambiguously state that "Hardrives would obtain a five-year-minimum property tax abatement from the City of Youngstown."  The writing said "5 yr min. tax abate."  There are no words of obligation present in this provision – it is not clearly a promise.  The only reasonable interpretation is that the agreement was conditioned upon the local tax authority providing the tax abatement.  This was an event, not certain to occur, which must occur, before performance under a contract became due.  *See Savage,* 897 N.E.2d at 200.  And, as noted above, Mr. Sabatine specifically admitted that the purported agreement was contingent on a 5 year minimum tax abatement.  Sabatine Dep. at p. 39, l. 12 - p. 40 l. 3.  Accordingly, the 5 year tax abatement was a condition precedent, and no contractual obligations arose until it was fulfilled.

The next question is whether the term "5 yr. min. tax abate." is ambiguous because the phrase does not specify what type of tax abatement was required.  The Court finds it unnecessary to address this issue.  Defendant mentioned the tax abatement condition in its opening brief in support of its motion for summary judgment, but Defendant never contended or demonstrated that the condition was unfulfilled.  ECF Dkt. #122 at 6, 19.[3]  Although Defendant contends in its reply brief that Plaintiff has failed to establish by way of Mr. Sabatine's testimony that the tax abatement had been secured, Plaintiff had no reciprocal burden to meet.  Therefore, the Court declines to consider Defendant's argument pertaining to the tax abatement condition, which was articulated for the first time in its reply brief.  *See, e.g., Hunt v. Big Lots Stores, Inc.*, 244 F.R.D. 394, 397 (N.D.Ohio,2007).  Accordingly, the tax abatement condition does not provide a basis for granting summary judgment.

**(c)** **"Free land"**

Defendant does not challenge that the "Free land" condition was satisfied.  *See* ECF Dkt.

---

[3]  Of note, Defendant contended the tax abatement condition as an "uncertain term."  ECF Dkt. # 122 at 18.  However, Defendant offered no argument as to whether the condition was ever satisfied.

-24-

#122 at 14- 20; ECF Dkt. #128 5-7.  Plaintiff stated that it entered a license agreement with the City of Youngstown to use the Center Street property for $1.00 per year.  ECF Dkt. #125 at 12.  Plaintiff contends that it agreed to cover the nominal cost so that RGI would have access to "free land" in accordance with the September 1, 1998 writing.  *Id.*

While Defendant does not explicitly contend that the "free land" condition went unsatisfied, Defendant contends that the September 1, 1998 pricing was contingent on the availability of a particular parcel of land:

> RGI premised its September 1 pricing on availability of the Ohio Works site because it had rail access already available at no improvement to rail would have been necessary.  The Center Street site, on the other hand, had no available rail siting and would have require considerable funding to make rail access available.  Once the Ohio Works site was no longer available, the pricing contingent upon that site was also no longer available.

ECF Dkt. #122 at 18 (internal citations omitted).  In its reply brief, Defendant contends that the "preliminary pricing structure" was based on the Ohio Works site and the site was never obtained. ECF Dkt. #128 at 6.

As Defendant's own brief states, "secret hopes and wishes count for nothing."  ECF Dkt. #122 at 17 quoting *Skycom*, 813 F.2d at 814-15.  The September 1, 1998 writing says nothing about the Ohio Works site.  If Defendant specifically required the Ohio Works site, then it should have insisted that term be included in the writing that Mr. Gould signed.  Based on the September 1, 1998 writing, the only condition was "Free land."  Therefore, once "Free land" was obtained and if the other conditions satisfied, a binding contract would be in place.

Admittedly, the "Free land" condition is ambiguous because not any land would satisfy the condition.  However, the ambiguity establishes a questions of fact for a jury.  What land would satisfy the written condition – where must it be located, what features must it have?  How would the condition be satisfied – by a purchase agreement or by physical occupation of the land?  The writing does not answer these questions, and the parties clearly disagree as to whether the September 1, 1998 writing contemplated any suitable land or specifically the Ohio Works site.  Apparently, the parties visited the Ohio Works site prior to signing the September 1, 1998 writing.  ECF Dkt. #122 at 5; #125 at 8.  Testimony regarding visits to the Ohio Works site and the Center Street site may

simply be evidence as to the definition of "land."  *See Smith v. Findlay College*, No. 5-83-35, 1984 WL 8095  at *2 (Ohio App.3d Dist. Oct. 22, 1984), unreported ("Thus, the term [,'academic year,'] is not defined as a matter of law and since the written contract is silent respecting same, both by specific definition or by interpretation of its other terms, the term remains ambiguous and extrinsic evidence must be resorted to and would be admissible in the trial of the action to define such term.").

Defendant has not directed the Court to extrinsic evidence showing that the parties could have only reasonably meant "Free land" to mean the Ohio Works site.  It is important to note, however, that the September 1, 1998 writing states "no improve to rail included."  ECF Dkt. #122, Ex. 1.  Defendant contends that the Ohio Works site "had rail access in place and needed no capital improvement."  ECF Dkt. #122 at 5.  Thus, the writing itself appears to contemplate that a site, other than the Ohio Works site, could have satisfied the "Free land" provision.

For the foregoing reasons, the Court finds that the "Free land" provision does not justify summary judgment.

### (d)    "no improve to rail included"

Defendant contends in its reply brief that "because it is beyond dispute that rail access was never obtained, the cost of 'improving' rail is not reflected in the pricing structure in the September 1 writing. . ."  ECF Dkt. #128 at 6 (internal citation omitted).  The foregoing quote could be construed as a concession that Defendant would pay for improving rails and adjust its pricing accordingly.  Under this construction, the provision is simply a notice that the prices were subject to change.  Plaintiff interprets the phrase "no improve to rail included"  to mean that RGI would not be required to contribute to any rail improvements.  ECF Dkt. #125 at 22.  Mr. Sabatine interpreted this provision as a condition – any agreement was contingent on RGI not having to pay for any rail improvements.  Sabatine Dep. at p. 39, l. 5 - p. 40, l. 3.

Either interpretation is reasonable.  It is reasonable to interpret the provision as a notice that the prices were subject to change because "included" could mean that the cost of rail improvements had not been accounted for in the price schedule.  This notice regarding the potential change in prices would not necessarily affect whether a meeting of the minds occurred.  It is also reasonable to interpret the provision as a condition because it is possible that the entire deal was contingent on

-26-

events uncertain to occur – either the parties securing land that had suitable rail access in place that would not require improvements,[4] or the parties negotiating an agreement with a railroad company that did not require RGI to pay for rail improvements.

Given that at least two reasonable interpretations exists, the provision is ambiguous.  It is unclear whether it is a notice or a condition.  If the provision was a condition, then a question exists as to whether it was satisfied.  Ultimately, a jury would have to resolve questions as to whether this provision is a notice or a condition and whether that condition has been satisfied.

Defendant also contends that its price schedule did not reflect rail improvements, which "supports the preliminary nature of the parties' negotiations."  ECF Dkt. #128 at 6. The Court finds this argument to be unpersuasive.  Defendant contends that this case is governed by the UCC.  The UCC specifically recognizes that parties can agree to sell goods without stating a price.  *See* O.R.C. §1302.18 ("The parties if they so intend can conclude a contract for sale even though the price is not settled. . .").  In the event that this writing is not governed by the UCC, the possible tentative nature of the pricing schedule presents a question of fact for a jury as to when a binding agreement would arise.  *See Woodward v. Glaser*, 93 N.E.2d 785, 787 (Ohio App. 2d Dist. 1950) ("The phrase, 'tentative purchase agreement' being in the contract as sued upon, must be accepted and given meaning. Its meaning not being elucidated in writing, testimony could be received as to circumstances attending and contemporaneous with the signing of the agreement to enable the jury to determine its true interpretation. In other words, in what particular or particulars is the contract tentative?").  Given the foregoing, a jury would have to determine if this contract was tentative and whether costs of rail improvement would prompt a price adjustment or completely void the quoted price term.

### (f)  Rail access

Defendant contends that: "Sabatine acknowledged that the September 1, 1998 writing contained several contingencies, including . . .  no cost rail. And he admits that the rail-access

---

[4]  *See* ECF Dkt. #122 at 5 ("RGI favored the Ohio Works site because it had rail access in place and needed no capital improvement.").

contingency was not satisfied.  Indeed, rail access never became available."  ECF Dkt. #122 at 19 (internal citations omitted).  Despite Defendant's assertion, the Court finds that the September 1, 1998 writing does not contain a clear and unambiguous condition requiring rail access to be provided before a binding agreement was in place.  As discussed above, the writing states "no improve to rail included."  ECF Dkt. #122, Ex. 1.  This phrase is not synonymous with "rail access, " as Defendant appears to assume.

As discussed above, "no improve to rail included" could either mean that pricing was subject to change due to rail improvement expenses, or that the pricing was wholly conditioned on the premise that RGI would not be responsible for any rail improvements.  Therefore, this provision does not clearly and unambiguously state that rail access shall be provided before the parties were bound to any contractual obligations.

For example, if the "no improve to rail included" provision is to be interpreted as a notice regarding a potential price change, then there is no indication on the face of the writing that the parties made any promises or agreed to any conditions pertaining to rail access.  It simply means that Plaintiff was on notice that the quoted prices could change if Defendant had to pay for rail improvements.  The provision does not impose a contractual obligation or a condition precedent pertaining to rail access.

If the "no improve to rail included" provision is a condition, and if the Court were to assume arguendo that rail access were an underlying term upon which the condition was predicated, then there would be ambiguities associated with defining the unwritten "rail access" term.  There is no written term dealing explicitly with rail access, so there is no indication as to whether the purported "rail access" term was a promise or a condition.  Further, there is no guidance as to how "rail access" is defined and how the condition would be satisfied (i.e., by entering an agreement with the rail company or by physically installing the rails).

Defendant contends that it is beyond dispute that rail access was never obtained.  ECF Dkt. #128 at 6 citing Sabatine Dep. at 40, 63-64.  The Court disagrees because whether rail access was obtained would depend on how "rail access" was defined.  Defendant points to testimony from Mr. Sabatine that purportedly acknowledges that rail access was never obtained.  ECF Dkt. #128 at 6

citing Sabatine Dep. at 40, 63-64.  Counsel asked Mr. Sabatine if he ever got railroad access into the Center Street site.  Sabatine Dep at p. 63 l. 23 - p. 64 l. 14.  Mr. Sabatine said "They agreed," but he admitted that tracks were never physically installed.  *Id*.  The agreement to which Mr. Sabatine referred may have satisfied any condition related to rail access, or perhaps the failure to install tracks constituted a failure of a condition precedent.  Without a written provision, the Court cannot definitively determine the matter.

Further, if the "no improve to rail included" term is a promise as opposed to a condition and if RGI breached the agreement before Hardrives' performance on the term was due, then it would be no defense that rail access was never obtained.  "Where promises in a contract remain unperformed by each party and the evidence is conflicting as to which committed the breach, or first breach, that issue should be submitted to the jury and the jury instructed as to the effect of its finding upon that issue." *Sentinel Consumer Prod. Inc. v. Mills, Hall, Walborn & Assoc., Inc.*, 673 N.E.2d 967, 970 (Ohio App. 11 Dist. 1996) quoting *Mays v. Hartman*, 77 N.E.2d 93 (Ohio App. 1 Dist.1947)*; Ehrhardt v. Hamilton Fan & Blower Co.*, Nos. C-850265, C-850266, 1986 WL 3423 at *5 (Ohio App., Mar. 19, 1986), unreported ("We agree with plaintiff that this breach, being material and the first to occur, relieved him of any further obligation to carry out his promises in the contract.").  Along these lines, Mr. Sabatine testified as follows:

> Q:  Did you ever get railroad access into the property at Center Street? And by you, I mean Hardrives.
>
> A:  Well, Rogers Group, all of a sudden after I ordered the plant and we started preparing to get set up, they just broke off discussions with me. I got a letter from them.  That was it.

Sabatine Dep. at p. 63, l. 23- p . 64, l. 4.  The question then, is whether Defendant improperly terminated the contract before Plaintiff's performance on any rail access term was due. *See infra* §V(B)(v) (finding that the September 1, 1998 writing could be terminated on reasonable notice, but whether Defendant's actions constituted reasonable notice would be a question of fact for a jury's determination).

Defendant contends that this case is governed by the UCC.  ECF Dkt. #122 at 22-24.  If it is, then Defendant is responsible to transfer and deliver the goods at issue. *See* O.R.C. § 1302.14

(under the UCC, "The obligation of the seller is to transfer and deliver. . .").  Absent an explicit provision requiring rail access, it appears that Defendant would be responsible for ensuring that the aggregate was "transferr[ed] and deliver[ed]" to Hardrives.

The Court cannot ignore the salient facts indicating that the aggregate was to be railed in to the distribution site, and of course some sort of rail access was *contemplated*.  In fact, Defendant acknowledges that the Mr. Sabatine tried to obtain rail access before the September 1, 1998 writing was executed.  ECF Dkt. #122 at 6.  But the record does not show that the parties ever reached an *agreement* or agreed on a condition pertaining to rail access.  The Court finds it inappropriate to grant summary judgment on a term that does not explicitly appear within the four corners of the disputed writing.

(g)    "@ 4.00 or less total rail include's [sic] cars"

Defendant does not contend that the $4.00 rate was never obtained.  ECF Dkt. #122 at 15-20.  Further,  Defendant does not appear to challenge Plaintiff's contention that any condition or promise pertaining to the rail rate was satisfied.  As noted above, Defendant's reply brief states: "Cranpark argues that the rail-access condition was satisfied because favorable rail rates were obtained. Mem. Opp. at 22-23. But a favorable rail rate is not the same as rail access, both of which are noted in the September 1 writing."  ECF Dkt. #128 at 6. Accordingly, the Court finds that no genuine issue of material fact exists as to this term.

v.    **Uncertainty**

Defendant raised the issue of uncertainty in its opening brief; however, it discussed uncertainty pertaining to the occurrence of events.  *See* ECF Dkt. #122 at 18-20.  Plaintiff contends that Defendant's arguments are largely the same as those pertaining to the meeting of the minds.  ECF Dkt. #125 at 23-25.  Defendant's reply brief states:

> Cranpark claims that RGI argued that the September 1 writing fails for lack of certainty because the parties did not obtain the Ohio Works site, tax abatement, or senior-management approval. Mem. Opp. at 23-25. **Cranpark misconstrues RGI's argument and confuses terms indicating unsatisfied conditions with terms indicating uncertainty or indefiniteness.**

ECF Dkt. #128 at 5 (emphasis added).  In its opening brief, however, Defendant argued that "The parties were both well aware that RGI's preliminary discussions to supply stone were premised on

-30-

several important **contingencies and uncertainties** that had to be resolved before there was a binding agreement." ECF Dkt. #122 at 18 (emphasis added). Defendant went on to argue that several contingencies existed in the document. *See* ECF Dkt. #122 at 18-20 (discussing factual uncertainties as to whether the Ohio Works site, rail access, and RGI senior management approval would be obtained). These provisions were discussed above as conditions precedent.

Although Defendant contends that multi-year pricing, product mix, and price escalators were uncertainties that were not defined in the September 1, 1998 writing, Defendant's brief offers very little argument regarding those purported uncertainties. *See Id.* at 19-20.

Defendant contends that the agreement is uncertain because it does not address multi-year pricing, product mix, and price escalators. *See* ECF Dkt. #122 at 5, 10, 20. Defendant contends that when these terms went undefined, "no formally executed contract approved by senior management was ever prepared or executed." ECF Dkt. #122 at 20. There is no indication in the September 1, 1998 writing that multi-year pricing, product mix, and price escalators were essential terms that would prevent a meeting of the minds from occurring with regard to #8 aggregate, #57 aggregate, #9 aggregate, Sand, and #304 aggregate, which were specifically mentioned in the writing. The parties could agree to buy and sell these types of aggregate without agreeing to terms on multi-year pricing, product mix, and price escalators. There is no indication in the September 1, 1998 writing that the parties reached any agreements pertaining to multi-year pricing, product mix, and price escalators. Further, there is no indication that the writing left those terms open to negotiation at a later time.

The absence of these provisions raises an interesting issue. The September 1, 1998 writing has no termination provision, and it would appear that the quoted prices would bind the parties indefinitely. However, "[i]t is a well established principle that where no time of termination is expressed, its duration continues for a reasonable time, terminable upon giving of reasonable notice." *Richter v. First Nat'l Bank of Cincinnati*, 80 N.E.2d 243, 245 (Ohio App. 1st Dist. 1947); O.R.C. §1302.22(c) (if no agreed event is stated for a contract for the sale of goods, then such an agreement may be terminated upon reasonable notification to the other party); *see also Miller v. Wikel Mfg. Co., Inc.*, 545 N.E.2d 76, 79 (Ohio 1989) (reaching same holding regarding oral

agreements).   Accordingly, a contract's failure to include a termination provision does not necessarily prevent a finding that a meeting of the minds has occurred.

If an agreement precipitated from the September 1, 1998 writing, either party could have terminated on reasonable notice.  The question of what constitutes reasonable notice would be reserved for a jury's determination based upon the facts of this case.

### vi.    UCC and Statute of Limitations

Defendant contends that, if the writing is an enforceable contract, its predominant purpose is to supply goods.  ECF Dkt. #122 at 22.  Defendant concludes that the agreement would be governed by the UCC and Plaintiff's breach of contract claim would be barred by the applicable four-year statute of limitations.  *Id.* at 22-26 citing O.R.C. §1302.98(A).

Plaintiff raises three responses to this defense: (a) the purported contract required the parties to jointly acquire land and a tax abatement; (b) the purported contract involved the payment of a royalty; and (c) the purported contract was more than a sales contract – it was a joint development deal.  ECF Dkt. #125 at 28.  The Court notes that the scope of the UCC is defined as:

> Unless the context otherwise requires, sections 1302.01 to 1302.98, inclusive, of the Revised Code, apply to transactions in goods; they do not apply to any transaction which although in the form of an unconditional contract to sell or present sale is intended to operate only as a security transaction nor do sections 1302.01 to 1302.98, inclusive, of the Revised Code impair or repeal any statute regulating sales to consumers, farmers, or other specified classes of buyers.

O.R.C. §1302.02.  The UCC defined 'goods,' in its pertinent part, as follows:

> "Goods" means all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale other than the money in which the price is to be paid, investment securities, and things in action. "Goods" also includes the unborn young of animals and growing crops and other identified things attached to realty as described in section 1302.03 of the Revised Code.

O.R.C. 1302.01(A)(8).  Therefore, the Court must determine of the September 1, 1998 writing constitutes a "transaction in goods."

### (a)    Real Estate

Plaintiff contends that:

> the September 1, 1998 contract also required the parties to jointly acquire both land and a tax abatement for the site of the distribution terminal and asphalt plant. By itself, this takes the contract out of the Ohio Commercial Code. *See Easterling v. Miller* (Dec. 31, 1997), 4th Dist. No. 97-CA-16, 1997 Ohio App. LEXIS 6049, at *7 (citing

R.C. 1302.01(A)(8) and R.C. 1302.02) (holding that the Ohio Commercial Code "specifically excludes transactions in real estate").

ECF Dkt. #125 at 27. The Court finds that Plaintiff has failed to meet its reciprocal burden of showing the necessity for a trial on the merits.

The Court finds the *Easterling* case to be inapposite because the legal claim in that case was for a breach of warranty deed. The Easterlings, purchased a parcel of land under a general warranty deed and a third party, Haney, brought an ejectment action asserting adverse possession. *Easterling*, 1998 WL 3642 at *1. The Easterlings agreed to settle the ejectment claim and transferred title to Haney. *Id*. The Easterlings then sued the Millers who had sold them the property. *Id*. The Easterlings asserted a claim for a breach of a general warranty deed. *Id*. The Easterlings also asserted consequential damages resulting from lost improvements to the property, such as a satellite dish and sand/gravel/limestone. *Id*. The Easterlings claimed that their damages were consequential and not improvements to the land, and were therefore covered by the Commercial Code. *Id*. at *3.

While it is true, as Plaintiff asserts, that the *Easterling* court stated that "Article II. . . specifically excludes transactions in real estate,"[5] the court went on to state that "Unlike the law of sales, the aggrieved party in a breach of a real estate covenant running with the land is limited in his recovery to the formula set forth in *King* and its progeny." *Easterling*, 1998 WL 3642 at *3. Therefore, the *Easterling* court was dealing with a very different case than the one at bar when it stated that Article II excludes transactions in real estate. The court was dealing with a claim for a breach of warranty deed, which is clearly part of a real estate transaction. The court did not need to reach the very important question of what constitutes a "real estate transaction" that is excluded from Article II.

The instant case presents no claim for a breach of warranty deed. In fact, it is far from it. The instant case involves the sale of aggregate, with a real estate transaction only arguably involved. Based on the words "Free land," it would be inaccurate to cast this entire transaction as a "real estate transaction," akin to the breach of warranty claim involved in *Easterling*.

---

[5] *Easterling*, 1998 WL 3642 at *3 citing R.C. 1302.01(A)(8) and R.C. 1302.02.

-33-

In *Easterling*, it appears that the "goods" at issue were not even sold; they were affixed to the property *after* it had transferred.  Accordingly, the Court finds *Easterling* to be distinguishable on the basis that it was purely a real estate dispute.  In contrast to *Easterling*, another court also considered a claim for a breach of warranty deed and indicated that it could be appropriate to conduct a term-by-term analysis and to apply the Commercial Code to the sale of goods provisions. *Spencer v. Huff*, No. 97CA2543, 1998 WL 391948 at *5 (Ohio App. 4 Dist. July 2, 1998), unreported (in considering a contract to sell a business, the court held that the UCC was inapplicable because the plaintiff's claim was based upon a breach of warranty deed and the plaintiff did not state any legal claims regarding the sale of goods that were included in the sale of the turn-key business.), *discussed infra*.

The case at bar appears to offer an issue of first impression: when a contract involves the sale of goods, as well as a real estate term, and the goods have no prior relationship to the real estate (*e.g.*, as a fixture, as a mineral, or as a crop) does the UCC apply, and to what extent?

In analogous situations, Ohio courts apply the following test when considering whether a mixed goods and services contract is governed by the UCC: "the test for the inclusion in or the exclusion from sales provisions is whether the predominant factor and purpose of the contract is the rendition of service, with goods incidentally involved, or whether the contract is for the sale of goods, with labor incidentally involved." *Allied Indus. Service Corp. v. Kasle Iron & Metals, Inc.*, 405 N.E.2d 307, 310 (Ohio App. 6th Dist. 1977).  At least one Ohio court has stated that " the 'predominant purpose' doctrine . . . does not apply to real estate transactions." *Fox & Lamberth Ents., Inc. v. Craftsmen Home Improvement, Inc.*, No. 21060, 2006 WL 759658 at *5 (Ohio App. 2 Dist., Mar. 24, 2006).  The Court notes, however, that this statement was dicta because the issue of a real estate transaction was not before the *Fox* court.  *Id*. at *5 ("[The predominant purpose test] would not be an issue in the present case, since the agreed-upon terms were for the sale of goods. In any event, there was no agreement for a lease. . . ").  Further, it makes sense that the predominant purpose test, as it is normally known, would not apply to real estate transactions because the test has typically been stated in terms of mixed goods and services contracts.  *See*, *e.g.*, *Allied Indus.*, 405 N.E.2d at 310.  As with *Easterling*, the *Fox* court's conclusion leaves unanswered the question

-34-

of how courts are to determine whether an agreement is a real estate transaction.  The *Fox* court's conclusion also leaves unanswered the question of whether a test, *analogous* to the predominant purpose test used in mixed goods and services contracts, could be applied to transactions that involve both goods and real estate.

Of course, claims for a breach of a general warranty deed are not covered by Article II.  *See Easterling*, 1998 WL 3642 at *3.  But, the *Easterling* court did not address the issue of what qualifies as a "real estate transaction" when it declared that real estate transactions are  excluded from Article II.  Surely not any transaction involving real estate to even the slightest degree is exempted from the UCC.  The UCC statute itself acknowledges this.  *See* O.R.C. §1302.03. Therefore, some test must apply to determine whether a given contract is a "real estate transaction" or if it is a transaction in goods, which is within the scope of the UCC.

The Court could adopt a predominant purpose test similar to the test employed in mixed goods and services contracts, or the Court could conduct a term-by-term analysis and apply the UCC only to terms related to the sale of goods.  The Court ultimately finds that either approach in this case would bring Plaintiff's breach of contract claim under the UCC.

If the Court were to adopt a predominant purpose test, it would look to the *Allied Indus.* "predominant factor" test as persuasive authority.  Therefore, the Court would determine whether the predominant factor and purpose of the contract is a real estate transaction, with goods incidentally involved, or whether the contract is for the sale of goods, with a real estate transaction involved. *See Allied Indus.*, 405 N.E.2d at 310.  In applying the test, the Court reiterates that it is unclear what the parties meant by "Free land."  But it can hardly be disputed that the predominant purpose of any purported agreement stemming from the September 1, 1998 writing involved the sale of goods and that a real estate transaction, if one was required, was only incidental.

Plaintiff contends that the question of whether a transaction predominately involves the sale of goods is a question of fact for a jury.  ECF Dkt. #125 at 28 citing *Mecanique C.N.C., Inc. v. Durr Environmental, Inc.*, 304 F.Supp.2d 971, 977 (S.D.Ohio,2004).  The *Mecanique* court stated that "[w]hether a transaction predominantly involves goods or services is *ordinarily* a question of fact for the jury." *Id*. at 976 (emphasis added); *see also Casserlie v. Shell Oil Co.,* No. 88361, 2007 WL

1559510 (Ohio App. 8 Dist. May 31, 2007), unreported (Judge Blackmon's concurring opinion acknowledges an Ohio court's authority to enter summary judgment on the question of predominant purpose: ". . . I believe that *Allied Indus.* [was] wrongly decided and should be abandoned as precedent in this area of the law. I believe strongly that in cases where the franchise agreement has both services and goods involved, the application of Article 2 of the Uniform Commercial Code to such mixed contracts should be a matter decided by a jury.").  Further, the *Mechanique* court found that no genuine issue of material fact existed because the plaintiff in that case could not point to any disputed facts that were relevant to the issue of whether the contract was primarily for goods or services.  *Id*. at 977.

The same is true here.  Even if the instant agreement arguably involved a real estate provision, it is obvious that the purpose of the "Free land" provision was to permit the sale of aggregate to Plaintiff.  In other words, the sale of aggregate was "the raison d'etre" of the September 1, 1998 writing and any real estate provision was an incidental provision to enable the ultimate ends of the transaction to be accomplished.  *See WICO Corp. v. Willis Industries*, 567 F.Supp. 352, 355 (D.C.Ill.,1983) ("But sale of goods is nevertheless the raison d'etre of the Agreements: All the service aspects of the Agreements are aimed at developing and increasing the market for Willis' graphics, and those graphics were to be sold by WICO. This simply is not a situation in which sale of goods is really incidental to the rendition of services.").  Therefore, it cannot be said that the predominant purpose of the agreement was to exchange real estate. And it cannot be said that any purported agreement was a "real estate transaction" that the *Easterling* court would exclude from the UCC.  Thus, under a "predominant purpose" test, the UCC would apply to the September 1, 1998 writing in its entirety.

The Court finds that the contract at issue in this case is not a "real estate transaction" because this contract involves a sale of goods with a real estate provision only incidentally involved. Therefore,  the Court finds that a predominant purpose test is appropriate.  The mere presence of a real estate provision does not take the entire agreement out of the UCC and does not render a predominant purpose test inappropriate here.

-36-

Alternatively, the Court notes that one Ohio court has alluded to the possibility of using a term-by-term analysis in mixed goods and real estate situations. *Spencer v. Huff*, No. 97CA2543, 1998 WL 391948 at *5 (Ohio App. 4 Dist. July 2, 1998), unreported. Under a term-by-term analysis, the UCC would apply only to the "sale of good" terms. *Id.* In *Spencer*, the Fourth District Court of Appeals of Ohio implicitly acknowledged that a mixed real estate and sale of goods contract could be governed by the UCC to the extent that goods are involved *if the plaintiff's legal claims involve the sale of goods*:

> The Spencers recognize that R.C. 1301 et seq. contains the Uniform Commercial Code ("UCC"), but assert that the UCC applies to the transaction here because the purchase agreement included not only the business and real estate, but also goods in the form of the store's existing stock. We disagree. By their plain language, the provisions of the UCC which the Spencers cite apply to warranties and contractual terms regarding goods only. **The Huffs based their claim against the Spencers on warranties and terms regarding the value of a turn-key business and the marketability of real property. Thus, to the limited extent that the purchase agreement involved the sale of goods, no warranties or terms regarding those goods are at issue here.** The trial court did not err by failing to apply the UCC.

1998 WL 391948 at *5 (emphasis added). Based upon *Spencer*, this Court could apply the UCC to the extent the September 1, 1998 writing and the claims before this Court apply to the sale of goods because the Parties contemplated exchanging payment for the aggregate on a per-tonnage basis with no apparent connection to the real estate.

Unlike the claims in *Spencer*, a review of the complaint and Plaintiff's expert's report shows that Plaintiff's cause of action is based upon the sale of aggregate, not a real estate transaction. The crux of this suit is Hardrive's purported reliance on favorable pricing terms contained in the September 1, 1998 writing. *See* ECF Dkt. #1 at ¶¶ 18, 21, 23. Plaintiff's damages arise from its alleged inability to find a substitute for Defendant's aggregate at a similar price. *Id.* As Defendant notes, Plaintiff has furnished an expert report calculating purported damages equal to $25.3 million, and that report is based entirely upon the pricing and royalty figures contained in the September 1, 1998 writing. *See* ECF Dkt. #122, Ex. 13; *but see* ECF Dkt. #1 at ¶23 (The complaint does not

-37-

allege or seek damages related to royalties), *discussed infra*.[6]  Therefore, Plaintiff's claim is based upon the sale of goods provision of the September 1, 1998 writing and the UCC would apply to the contractual terms giving rise to Plaintiff's breach of contract claim.

Whether the Court were to use a predominant purpose test and apply the UCC to the entire agreement or whether the Court were to apply a term-by-term analysis for the purchase of aggregate, the pricing terms underlying Plaintiff's claim are subject to the UCC's four-year statute of limitations.  *See* 1302.98(A).  It is undisputed that Plaintiff filed the instant suit outside of the four-year statute of limitations.  *See* ECF Dkt. #125 at 27-29.  On March 9, 1999, Mr. Sabatine sent a letter to Mr. Gould indicating that RGI had canceled the agreement. ECF Dkt. #122, Ex. 8; *see also*, ECF Dkt. #1 (¶19 alleges that RGI chose to terminate the agreement in spring of 1999).  The instant suit was not filed until October 8, 2004, over four years later.  Thus, Plaintiff's breach of contract claim must be dismissed with prejudice, unless the September 1, 1998 writing is removed from the UCC for another reason.  As discussed below, however, the Court finds that no other reason justifies removing the purported agreement from the UCC.

### (b)    Royalties

Plaintiff also contends that the writing provided that Hardrives was to receive a royalty on all non-Hardrives sales.  ECF Dkt. #125 at 28.  Plaintiff contends that:

> it is undisputed that the September 1, 1998 contract also contained a provision whereby Hardrives was to receive a $0.50/ton royalty on all RGI aggregate sales to customers other than Hardrives.  By itself, this takes the Contract out of the Ohio Commercial Code as well.  See *Warren/Sherer Division of Kysor Industrial Corporation v. Store Equipment Co. Inc.*, (Jul. 21, 1983), 10th Dist. No. 82AP-149, 1983 Ohio App. LEXIS 15062 at *12-13 (**holding that the Ohio Commercial Code does not apply *to contracts* involving commissions even when the commissions are**

---

[6]  The Court finds it is highly questionable that a damage figure of $25.3 million could be sustained at a jury trial because either party could terminate the purported agreement on reasonable notice.  *See Richter*, 80 N.E.2d at 245; O.R.C. §1302.22(c); *see also Miller*, 545 N.E.2d at 7, *discussed supra*.  Whether Defendant provided reasonable notice here would be a question for a jury's determination.  However, Plaintiff's expert apparently assumed that the September 1, 1998 writing would bind the parties indefinitely.  *See* ECF Dkt. #122, Ex. 13 ("Under Scenario 2, the $2 million loss of contribution margin, royalties and cost savings would continue until the year 2009.  Losses fo $2 million per year from 2000-2009 yield total past losses of $20.7 million.").  Whether the UCC or the common law applies, that assumption is legally invalid.  *See Richter*, 80 N.E.2d at 245; O.R.C. §1302.22(c); *see also Miller*, 545 N.E.2d at 7, *discussed supra*.  At some point Defendant could have terminated the purported agreement on reasonable notice.

**measured by the sale of goods.**)

ECF Dkt. #125 at 28 (emphasis added).

Plaintiff's interpretation of the *Warren* case is erroneous.  The *Warren* court did not say that the UCC does not apply to *contracts* involving commissions, the court stated that the UCC "**does not apply to *actions* for commissions which may be measured by sales but, rather, such section refers to contracts for sales.**"  *Warren*, 1983 Ohio App. LEXIS 15062 at *13 (emphasis added). This holding leaves the same question that the Court considered with the mixed real estate and goods contract in subsection (a), above.  How should the Court treat a contract that involves provisions for both the sale of goods and for royalties?

Again an analogous "predominant purpose" test could apply, or the Court could apply the UCC on a term-by-term basis to the sale of goods terms.  What is clear from *Warren* is that the Court must look to the nature of the action.  Thus, Plaintiff's reliance on *Warren* fails to establish a genuine issue of material fact because Plaintiff's action is not based upon a loss of royalty or commission.  *See* ECF Dkt. #1.  Although Plaintiff's expert report claims lost royalties, the complaint does not allege that it suffered lost royalties and the complaint does not seek royalties. *See*  ECF Dkt. #1.  Instead, the complaint alleges lost income from existing projects and future projects:

> As the direct and proximate result of the foregoing, Hardrives incurred losses of income from existing projects, increased expenses to complete its work, loss of future revenue from projects it could not bid and would have if RGI had not breached the agreement, all of which ultimately led to the inability of Hardrives to remain in business, and was forced to sell most of its asset to other entities to meet its debts.

ECF Dkt. #1 at ¶23.  Thus, the claims here involve lost profits that Plaintiff expected based upon favorable aggregate prices contained in the September 1, 1998 writing.

The *Warren* case is distinguishable from this case because the agreement in that case involved a claim for commission to be paid for a service – selling goods.  Although the agreement was closely related to the sale of goods, it appears from the facts giving rise to the suit that the defendant never took a possessory interest in the goods.  He merely acted as an agent connecting a prospective buyer with the manufacturer.  Therefore, the plaintiff and the defendant did not complete transactions in goods.

-39-

The defendant in the *Warren* case, Kabealo, agreed to work for a commission to sell coolers and freezers that supermarkets use to display foods.  *Warren*, 1983 Ohio App. LEXIS 15062 *Id*. at *2.  The dispute in *Warren* involved a particular supermarket, Big Bear, who was purchasing units directly from Warren, and Kabealo was receiving a commission upon Warren's receipt of the invoice.  *Id*.  Kabealo subsequently guaranteed the customer's account with Warren, and Kabealo himself became delinquent on payments.  *Id*. at *3.  At that point, Warren stopped selling units to Big Bear and terminated Kabealo's distributorship.  *Id*. at *4.  Kabealo executed a note to settle his delinquent account with Warren.  *Id*. at *5.  When Kabealo defaulted on that note, Warren sued.  *Id*  Importantly, this note and the resulting claim were not the subject of the *Warren* court's holding related to the UCC.  Rather, the court's holding addressed Kabealo's counterclaim to recover the commissions that were purportedly owed to him.  *Id*. at *6-7.

The issue on appeal involving the Commercial Code was whether Kabealo's counterclaim for commissions was barred by the UCC's four-year statute of limitations.  *Warren*, 1983 Ohio App. LEXIS 15062 *Id*. at *11.  It was in that context that the court stated that Article II that "does not apply to **actions** for commissions which may be measured by sales. . ." *Id*. at *12.  To explain the *Warren* holding the Court considers this hypothetical: if a customer purchases an automobile from a dealership, that transaction would be a transaction in goods within the scope of the UCC.  However, under *Warren*, if the automobile dealership fails to pay the sales associate a commission, that claim would not be within the scope of the UCC.  It is clear that the *Warren* case is distinguishable from the case at bar as a matter of law because the claim here is for a purported agreement to supply goods, not for a failure to pay a sales commission.  *See* ECF Dkt. #  *See* ECF Dkt. #1 at ¶¶ 18, 21, 23.

The Court notes that Defendant cites *Casserlie v. Shell Oil Co.*, in its reply brief for the proposition that a commission provision does not detract from the predominant purpose of the contract.  ECF Dkt. #128 at 11 citing , No. 88361, 2007 WL 1559510 (Ohio App. 8 Dist. May 31, 2007), unreported.  The Court expressly notes that it is not relying upon *Shell Oil*.

In *Shell Oil*, the court considered a situation where franchisees could agree to transform automotive repair stations into convenience store stations.  *Id*.  The Court held that the UCC applied

-40-

and the plaintiff's claim for  breach of contract was barred by the four-year statute of limitations because:

> In the instant case, it is clear that, pursuant to the dealer agreements, the sale of gasoline is the predominant factor giving rise to the relationship of the parties. We agree with the trial court that although other obligations flow from the various agreements between the parties, the critical factor giving rise to the relationship, as well as the price discrimination claims, was the sale of Shell-branded gas. Moreover, the new plaintiffs' claims for bad faith pricing arose exclusively under the open price provision of the dealer agreements, which related exclusively to the sale of gasoline.

*Id.* at *13.  *Shell Oil* is of minimal precedential value in the case at bar because the argument before that court was "that the fifteen-year statute of limitations contained in R.C. 2305.06 should apply to this case because [the plaintiffs'] contracts with Shell did not solely concern the sale of goods, but also included the operation of their automobile service stations." *Id.*  Thus, the court did not address the issue of royalties or commissions.  The *Shell Oil* court considered only an ordinary mixed goods and services question and applied the same test that was articulated in *Allied Indus. Id.*

Regardless, the Court finds that Plaintiff's reliance upon *Warren* falls short of meeting Plaintiff's reciprocal burden of demonstrating the need for a trial on the merits.  Accordingly, the Court proceeds to address Plaintiff's argument regarding the purported "joint development deal."

### (c)        "Joint Development Deal"

Plaintiff contends that the September 1, 1998 writing was not a "mere 'sales contract,' " it was a "joint development deal specifically designed so that RGI could seize upon the 500 million ton void left by Essroc in the Mahoning Valley / Youngstown aggregate market." ECF Dkt. #125 at 28; *see also* ECF Dkt. #125 at 22, 27.  Plaintiff has provided no authority on what a "joint development deal" is.  *Id.*

Notably, Plaintiff initially contended that the purported agreement was a "business partnership." ECF Dkt. #1 at 5.  Even within the same sentence of Plaintiff's response brief, it states "The **partnership** between Hardrives and RGI was a **joint development deal**. . ." ECF Dkt. #125 at 28 (emphasis added).  Elsewhere, Plaintiff's summary judgment response brief asserts that RGI  "abandon[ed] the partnership with Hardrives." *Id.* at 15.   In a recent motion to compel production of discovery materials, Plaintiff even took the position that the agreement was a joint

venture agreement.[7]

In sum, Plaintiff's position on the respective legal status of the parties is inconsistent.  The Court will consider each of the three entities/arrangements: partnerships, joint ventures, and joint developments.

In Ohio, a partnership is defined as "an entity of two or more persons to carry on **as co-owners of a business** for profit . . ."  O.R.C. §1775.05 (emphasis added).  "A contract . . .is essential to the formation of a partnership.  Among the essentials of every contract are two competent contracting parties, and mutuality of obligation."  *Payne v. Thompson*, 5 N.E. 654, 656 (Ohio 1886).   Although the parties dispute whether a contract exists, there is no evidence before the Court that the parties ever agreed to jointly own a single for-profit business.  All of the evidence before the Court indicates that the parties were to maintain their separate identities and no third entity would be formed.  Further, the September 1, 1998 writing makes no mention of a partnership.  *See  Matter of Sluss*, 56 B.R. 575, 579 (Bkrtcy.S.D.Ohio,1986) (". . .the absence of the term [,'partnership,'] is at least some evidence of a lack of intent to form a partnership.").  There being no evidence in support of an intent to form a partnership before this Court, the Court finds that the September 1, 1998 writing is not a partnership agreement.

Since Plaintiff nowhere uses the term "joint venture" in its response to Defendant's motion for summary judgment, Plaintiff has failed to demonstrate that the September 1, 1998 writing is a joint venture agreement.  Nevertheless, the Court will discuss these enterprises because Plaintiff has raised the issue in the past and because it is unclear what Plaintiff means by "joint development deal."  *See* ECF Dkt. #98.  The Supreme Court of Ohio has defined a joint venture as follows:

> A joint venture is '* * * an association of persons with intent, by way of contract, express or implied, to engage in and carry out a single business adventure for joint profit, for which purpose they combine their efforts, property, money, skill and knowledge, **without creating a partnership**, and agree that there shall be a community of interest among them as to the purpose of the undertaking, and that each

---

[7]     Notably, when Plaintiff asserted that documents were missing, it stated "common sense dictates that **when two parties work for months on a joint venture**, paper is created, e-mails are generated, memoranda are created, and due diligence is performed."  ECF Dkt. #98 at 6 (emphasis added).  Now Plaintiff no longer contends that the agreement is a joint venture, but a joint development deal.

coadventurer shall stand in the relation of principal, as well as agent, as to each of the other coadventurers * * *.'

*Al Johnson Construction Co. v. Kosydar*, 42 Ohio St.2d 29, 325 N.E.2d 549, 552 (Ohio 1975)

quoting *Ford v. McCue*, 163 Ohio St. 498, 127 N.E.2d 209 (emphasis added).

The "community of interest" element is clearly missing in the case at bar.  One Ohio court has aptly stated:

> the parties to a joint venture must have "a community of interest in the purpose of the undertaking, and equal authority or right to direct and govern the movements and conduct of each other in connection therewith." *Ford*, 163 Ohio St. at 502-503, 56 O.O. 410, 127 N.E.2d 209. "In a joint adventure each adventurer is a principal with power of direction and control as to his coadventurers, and each of the other adventurers is his agent within the scope of the enterprise in which they are all engaged." *Id.* at 503, 56 O.O. 410, 127 N.E.2d 209. **Where, as in the case at bar, the contract clearly outlines each party's separate role in the operation of a program and those roles are distinctive as to such matters as legal ownership of property, control over day-to-day operations, construction, maintenance, employee management, and establishment of fees, the evidence will not demonstrate that there was joint control or a community of interest.** *Sylvester Material Co., Inc. v. Environmental Network & Mgt. Corp.* (1999), Seneca App. No. 13-99-40, unreported, 1999 WL 1243209.
>
> &ast;  &ast;  &ast;
>
> neither party has the authority to equally direct and control the other with respect to "all aspects of the [alleged] enterprise." *Clifton v. Van Dresser Corp.* (1991), 73 Ohio App.3d 202, 211, 596 N.E.2d 1075. **A joint venture does not exist unless both parties have the equal authority and the right to direct and control all aspects of the enterprise.** *Id*.

*Grendell v. Ohio Environmental Protection Agency*, 764 N.E.2d 1067, 1075-76 (Ohio App. 9 Dist.,2001) (emphasis added).  Based on the foregoing, it is clear that many of the elements of a joint venture are absent in the case at bar.

Here, the parties had distinctive roles.  There is no evidence that the parties had equal authority and the right to direct and control all aspects of the enterprise.  There is no evidence that Hardrives would participate in the governance of RGI's on-site operation.  Likewise, there is no evidence that RGI had any role in governing Hardrives' on-site operations.  The only interaction the two companies would have once the purported deal was complete is that RGI would sell aggregate to Hardrives.

Further, there is no evidence of profit or loss sharing.  The Ohio Supreme Court explicitly requires a jointly sought profit in a joint venture agreement:

> A profit jointly sought in a single transaction by the parties thereto is the chief characteristic of a joint business adventure, and the profit accruing must be joint and not several. There must also be a sharing of losses as well as profits.

*Ford*, 163 Ohio St. at 503, 56 O.O. 410, 127 N.E.2d 209; *see also*, *Grendell*, 764 N.E.2d at 1076 ("In the case at bar, there is no agreement between the state and Envirotest to share profits and losses.").   The profit sought in this case was clearly several.  If an agreement was in place, Hardrives agreed to pay RGI according to a price schedule.  RGI would make its profit based on any amount it marked up the aggregate before selling to Hardrives, and Hardrives would make its profit by entering "significantly lower bids for public works."  *See* ECF Dkt. #1 at ¶6.  There was no provision in the September 1, 1998 writing envisioning profit sharing.  Plaintiff's expert's calculations of damages do not make any mention of profit sharing and attribute all potentially earned profit on paving projects to Hardrives and none to RGI.  *See* ECF Dkt. #122, Ex. 13.  There is no indication that the parties ever agreed that this purported enterprise would be anything more than a supply of goods relationship with the buyer to pay according to a pricing schedule.  Thus, there was no common income to be shared or lost.  *See Kahle v. Turner*, 420 N.E.2d 127, 130 (Ohio App. 5th Dist. 1979) (indicating that joint venture income must be pooled, but acknowledging that expenses need not be: "We find no requirement that the members of a joint venture must pool expenses **as well as income**; that is a characteristic of a partnership. In joint ventures, pooling of expenses is not an absolute necessity.") (emphasis added).

The chance that Hardrives' and RGI's profits and losses might have been correlated does not establish that a profit sharing agreement existed.  *See Eynon v. Pullman Hoffman, Inc.*, Case No. 96-CA-0109, 1996 WL 753198 (Ohio App. 5 Dist.,1996), unreported.  In *Enyon*, a contractor entered an agreement with a steel company to install a sprinkler system.  *Id*. at *1.  The contractor then hired a sub contractor.  *Id*.  The steel company filed bankruptcy.  *Id*.  The common pleas court found that the contractor and the subcontractor were joint venturers.  *Id*. at *2.  The court then found that the contractor violated an ensuing fiduciary relationship to share profits.  *Id*.  The appellate

court held that the trial court erred, finding that the parties did not envision the sharing of profits or losses. *Id.* (the court did not reverse because the error was harmless). Interestingly, both parties stood to make a profit if the project was completed and if the steel company paid, and both companies obviously shared a risk, as evidenced by the steel company's bankruptcy and nonpayment. Thus, the mere fact that two companies' profits and losses are correlated does not establish a profit and loss sharing arrangement. Rather, there must be evidence of an *agreement* to share at least profits; an agreement to share losses can be implied therefrom. *Ford*, 127 N.E.2d at 212-13; *Kahle*, 420 N.E.2d at 130.

Given that the parties never agreed to joint control, a community of interest, or profit sharing, the Court finds that no joint venture exists.

Lastly, the Court considers whether the purported agreement establishes a "joint development deal." Plaintiff has directed the Court to no Ohio law defining the phrases "joint development deal" or "joint development," and the Court has found none in its own research. *See* ECF Dkt. #125 at 22, 27, 28.

Again, the Court notes that Plaintiff's brief states that, "The **partnership** between Hardrives and RGI was a **joint development deal**. . ." ECF Dkt. #125 at 28 (emphasis added). If a joint development deal is analogous to a joint venture, then Plaintiff's argument is inconsistent because a joint venture cannot involve the creation of a partnership. *See Al Johnson Const.*, 325 N.E.2d at 552. If a joint development deal is not analogous to a joint venture, then Plaintiff has provided the Court with absolutely no guidance on how such an arrangement is established and what the significance of a joint development deal is.

Regardless, the Court is ultimately concerned with whether the instant case presents a genuine issue of material fact as to whether the September 1, 1998 writing is governed by the UCC. There can be no disputing that the primary purpose of the writing was to sell and purchase aggregate. Plaintiff contends that "the deal involved, among other things, land acquisition, tax abatements, construction of the joint distribution terminal and asphalt plant, installation of rail access, development dollars, a royalty agreement, and various negotiations with third parties (i.e., the City of Youngstown and Norfolk Southern)." ECF Dkt. #125 at 28. These elements do not

establish that the purported agreement had a predominant purpose other than for the sale of goods. All of the elements to which Plaintiff directs the Court were events that had to occur to enable RGI to supply aggregate to Hardrives. In fact, Mr. Sabatine admitted in his deposition that he believed the agreement was "contingent on free land, a five-year minimum tax abatement, and [RGI] not having to make any rail improvements." Sabatine Dep. p. 39, l. 20 - p. 40- l.2. Thus, those terms were not the purpose of the agreement, but contingencies upon which the agreement was based. The other terms to which Plaintiff directs the Court – construction of the joint distribution terminal and asphalt plant, installation of rail access, development dollars, and various negotiations with third parties (i.e., the City of Youngstown and Norfolk Southern) – appear nowhere in the written agreement. There is absolutely no written indication that either party was bound to install a distribution terminal or asphalt plant or that this facility would be jointly owned and operated. Further, there is no reference to "development dollars," and Plaintiff offers no explanation as to what that term means. As far as negotiations with third parties are concerned, those apparently involved satisfaction of the contingencies underlying the purported agreement to sell goods. Lastly, Plaintiff again mentions the royalty payment. That matter was discussed above and does not remove this case from the UCC and is clearly only ancillary to any other agreement because there is no apparent reason for RGI to pay Hardrives a royalty without a primary sales agreement in place.

Even if this purported agreement was to involve a more sophisticated plan, requiring joint development of an asphalt plant and a distribution terminal, the writing makes no mention of this term. Therefore, the writing before the Court is far too sparse and ambiguous to be support a finding that a meeting of the minds on anything more than a sale of goods occurred. Further, Plaintiff has directed the Court to no evidence that the parties ever agreed to jointly construct and operate a facility. In fact, the objective evidence proves another conclusion to be true. Mr. Sabatine ordered an asphalt plant and allegedly invested $1,500,000.00 of Hardrives' money on December 15, 1998, before the alleged breach occurred. *See* ECF Dkt. #125 at 13 citing Sabatine Dep. at 28-29, 41-42, Ex. 23. The purchase order for the asphalt plant indicates that the plant was "Sold To: Hardrives Asphalt Paving Inc." ECF Dkt. #125, Ex. 23. The purchase order makes no reference to RGI as a joint owner. *Id.*

-46-

Thus, if the September 1, 1998 writing could establish that a meeting of the minds occurred, it could only reasonably establish that the parties agreed to a contract with the predominant purpose to buy and sell aggregate.  There is no genuine issue of material fact as to whether there was a meeting of the minds for anything more than the sale of goods.  Even if the written agreement supported a finding that the parties reached an agreement to sell goods, it is barred by the UCC statute of limitations.  O.R.C. §1302.98(A).

### **(d)**     **Conclusion**

For the foregoing reasons, the Court finds that even if the September 1, 1998 writing can be interpreted as an agreement, it can only be interpreted predominantly as a contract for the sale of goods.  Further, the instant breach of contract claim contained in Count I of the complaint  was filed beyond the four year statute of limitations.  Accordingly, Count I of the complaint is dismissed with prejudice.

### **C.**     **COUNT II: Promissory Estoppel Claim Analysis**

Defendant also contends that the Court should grant summary judgment on Plaintiff's promissory estoppel claim because there is no evidence of a clear and unambiguous promise and it was not reasonable for Hardrives to rely on any purported promise. ECF Dkt. #122 at 20.

In Ohio, the elements of promissory estoppel are:  (1) a clear and unambiguous promise; (2) reliance upon the promise; (3) reliance that is both reasonable and foreseeable; and (4) injury to the party as a result of the reliance.  *Kirkland v. St. Elizabeth Hosp.*, 120 F.Supp.2d 660, 670 (N.D. Ohio, 2000) citing  *Weiper v. W.A. Hill & Assoc.*, 661 N.E.2d 796 (Ohio App. 1 Dist. 1995).

As explained above, the September 1, 1998 writing was expressly conditioned on RGI senior management approval.  On Mr. Sabatine's own admission, the condition was never satisfied.  Therefore, any reliance on the September 1, 1998 price list was unreasonable.  *See Allen v. Ford Motor Co,* No. 98-3807, 1999 WL 644345 at *3 (6th Cir. Aug. 18, 1999) , unreported ("it was not reasonable for Allen to believe that Ford would follow through on its qualified promise without the signature condition being met".).

Mr. Sabatine testified as follows:

Q     All right.  It was also, was it not, contingent on, it was subject to RGI, which

-47-

is Rogers Group, Inc., senior management approval; isn't that true?

A    Well, I was dealing with Greg Gould, who represented that he was in charge of that division.

Q    But Greg's the person who signed down here; right?

A    I guess that's who signed that down there.  I don't think it was Tom, but –

Q    Okay.  And he put above his signature that everything here was subject to RGI senior management approval?

A    That he was senior management.

Q    Well, then why would he have put that condition in the clause?

A    You'd have to ask him.

Q    Okay.  If he wasn't senior management, would that condition be subject to somebody up the chain from him approving it?

A    He was the one directing the whole operation here.  He was giving Tom Stump direction, who was the division manager of Ohio.  He was telling the other Rogers people what to do.  He was the one having, picking me up in the helicopter.  So I mean, he was just, he was telling me that he was the boss.  You know, I'm not saying that maybe there was somebody over him.

**Q    Do you have any other document, a letter of a contract or anything from anybody else at Rogers Group saying, we approve the agreement that you made on September 1, 1998?**

**A    Not that I'm aware of. I was dealing exclusively with, you know, three or four people from Rogers.**

**Q    But you never got any subsequent letter from them saying –**

**A    I was always –**

**Q    – this deal's on?**

**A    I was always promised that it was forthcoming.**

**Q    But did you ever receive it?**

**A    But then when I had the airport, you know I'm over here bidding on projects on their word; and I ordered a new asphalt plant after I spoke to them and they said that it was forthcoming, go ahead, order the plant.**

Sabatine Dep. at 40-42 (emphasis added). Mr. Sabatine's impression that Mr. Gould was senior

management does not change the fact that Mr. Gould signed this document and the document states

-48-

that it was "SUBJECT TO RGI SR. MGT. APPROVAL".[8]  There would be no apparent purpose to this language if the condition could be satisfied by Mr. Gould's signature on the document. Therefore, the language, "SUBJECT TO RGI SR. MGT. APPROVAL", can only reasonably be interpreted as imposing a condition.

In the context of Plaintiff's promissory estoppel claim, it is immaterial that Defendant has failed to demonstrate good faith in attempting to obtain senior management approval.  *See Allen*, 1999 WL 644345 at *2-3 (holding that it was unreasonable to rely on a promise that was conditioned on obtaining the signature of an authorized agent, while that condition had not been met).  What is important is that Mr. Sabatine was aware that the prices were subject to senior management approval and that such approval was never granted.  Therefore, any actions he took in reliance on the September 1, 1998 writing were at his own risk.

Plaintiff also contends that Mr. Sabatine relied on oral representations by RGI.  Specifically, Plaintiff contends that Mr. Sabatine called RGI to confirm that the deal was still going forward before he purchased a new asphalt plant and began bidding on paving jobs.  ECF Dkt. #125 at 26. Plaintiff contends that RGI assured Mr. Sabatine that everything was in order and that he should "buy the plant."  *Id*. citing Sabatine Dep. at p. 28, l. 18 - p. 29, l. 5.  Mr. Sabatine's deposition testimony does not establish a genuine issue of material fact.  He testified as follows:

> And before, you know, I ordered the asphalt plant, I'll never forget, I wanted an agreement in writing from them.  And I called them up on the phone; they said it was forthcoming, but go ahead, you know, buy the plant, which I did.  And then to top it off, the whole winter I had three or four laboratory people testing aggregates for the airport project.  And they delivered all the materials that they were going to be railing in to me in bags, and we tested their material.  Nobody else's.  Material coming from, I think it was coming from Sandusky, Ohio.  Tested the material, made, designed all the job mixes for the airport job with Rogers' mixes that they were going to rail in to me.

Sabatine Dep. at p. 28, l. 18 - p. 29, l. 5.  Mr. Sabatine never identifies who told him to buy the

---

[8]  Notably, the document was not prepared in advance, it was drafted at the meeting between Mr. Sabatine and Mr. Gould. Sabatine Dep. at p. 32, l. 10-11.  Further, Mr. Sabatine did not write "SUBJECT TO RGI SR. MGT. APPROVAL",  on the document.  *Id*. at p. 35, l. 15-18; *see also* Stump Dep. at p. 120, l. 17-23 (contending that he did not write subject to senior management approval); Gould Dep. at p.68, l. 2-5 (contending that he wrote the senior management approval term).

plant.  Further, his testimony is self-serving.  *See Comfort Trane Air Conditioning Co. v. Trane Co.*, 592 F.2d 1373, 1383 (5th Cir.1979) ("Unsupported, self-serving testimony is not substantial evidence sufficient to create a jury question.") cited with approval in *Brooks v. American Broadcasting Companies, Inc.*, 999 F.2d 167 (6th Cir. 1993).  Mr. Sabatine's self-serving testimony related to RGI's alleged oral representations is insufficient to create genuine issues of material fact.

Plaintiff further contends that Mr. Sabatine relied on actions by RGI representative Tom Stump.  Plaintiff contends that Mr. Stump delivered aggregate mix samples to Hardrives "knowing that Hardrives intended to (and did) rely on the promised aggregate prices in preparing bids for various paving contracts. (Stump Depo at 123:2-22.)."  Plaintiff has mischaracterized Mr. Stump's testimony, as he stated nothing about pricing.  Mr. Stump testified as follows:

> Q    Okay.  Do you know if by September, Jim had bid on and gotten the airport contract?
>
> A    I don't know if he got it.  I know he had the contract.[9]
>
> Q    And there would be specific mix requirements for an airport job?
>
> A    Certainly
>
> Q    Did you drop off samples to Jim?
>
> A    Yes.
>
> Q    And would that have been in September/October of '98?
>
> A    Don't know exactly when but I do recall dropping off samples.
>
> Q    More than once?
>
> A    Don't know that.
>
> Q    Pretty big bags, though, of samples, though, right?
>
> A    Yeah.  It's a big, yeah, I mean, you know 30, 40 pound sample bags.
>
> Q    But you remember doing that?
>
> A    Yes.

Stump Dep. at p. 123, l. 2-22.

---

[9]    These two sentences appear to be inconsistent.  The Court surmises that a word may be missing from the record.

-50-

As shown above, the samples that Mr. Stump delivered were only for an airport job.  Mr. Sabatine also testified that the samples were intended for the airport paving job.  Sabatine Dep. at p. 28, l. 22-p. 29, l. 5; p. 129, l. 8-11.

Importantly, Plaintiff has provided no evidence demonstrating that Hardrives bid on the airport job after receiving the September 1, 1998 pricing.  In its response to Defendant's motion for summary judgment, Plaintiff's statement of facts alleges that:

> Contracts that Hardrives bid on and won based on the prices set forth in the September 1, 1998 agreement included the Youngstown Airport paving job (Hardrives' largest contract), the Liberty Township street resurfacing job, and a number of other paving jobs for the State of Ohio. (Sabatine Depo at 28:22-29:5, 41:9-42:1, 109:25-110:24, 140:2-141:13.)

ECF Dkt. #125 at 13.  As discussed above, both Mr. Stump and Mr. Sabatine testified that the samples were for the airport project.  Therefore, there is no genuine issue of material fact pertaining to other paving jobs.

Further, none of the deposition citations furnished by Plaintiff (ECF Dkt. #125 at 13 citing Sabatine Dep. at 28:22-29:5, 41:9-42:1, 109:25-110:24, 140:2-141:13) establish that Hardrives entered a bid on the Youngstown Airport job after September 1, 1998.  *See* Sabatine Dep. at 110 (the Youngstown Airport job was the largest that Hardrives had ever done); *Id*. at 141 (the airport was completed in two phases, taking place in 1998 and 1999).  Thus, there is no evidence before the Court to indicate that Hardrives relied upon the September 1, 1998 pricing in bidding the Youngstown Airport project.  Likewise, there is no genuine issue of material fact as to whether it was foreseeable that Hardrives would rely on the September 1, 1998 pricing in bidding on the Youngstown airport project and there is no genuine issue of material fact as to whether Hardrives' reliance was reasonable.

Further, the fact that Mr. Stump provided aggregate samples to Mr. Sabatine does not establish a clear and unambiguous promise to provide aggregate at the September 1, 1998 pricing levels.  On his own admission, Mr. Sabatine knew that RGI senior management approval had not been secured.  As Mr. Sabatine acknowledged, Mr. Gould was giving Mr. Stump directions. Sabatine Dep. at p.41, l.2-4.  Since Mr. Gould was not senior management, Mr. Stump clearly was not either.  Thus, the foregoing quote from Mr. Stump's deposition does not establish a basis for

-51-

reasonable reliance.  Plaintiff has not directed the Court to any evidence indicating that Mr. Stump represented that he was operating with authority from RGI senior management.  *See* ECF Dkt. #125 at 26 citing Stump Dep. at p. 123, l. 2-22.

Plaintiff asserts that "RGI was aware of and encouraged Hardrives to bid on these jobs in reliance on the September 1, 1998 contract and aggregate mix deigns [sic] provided by Stump because of the mutual benefit the jobs would provide to both parties. (Sabatine Depo at 128:4-129:11.)"  ECF Dkt. #125 at 13.  Mr. Sabatine's deposition reflects that "Tom Stump and one of his assistants" dropped off the aggregate.  Stump. Dep. at p. 120, l. 8-9.  Nowhere in the cited portion of Mr. Sabatine's testimony does he even allege that Mr. Stump asserted that he was acting with any kind of authority from RGI senior management as the September 1, 1998 writing required.  Accordingly, even if Mr. Stump's action can somehow be interpreted as a promise to honor the September 1, 1998 pricing, Mr. Sabatine's reliance on Mr. Stump's representation cannot be considered reasonable.  A higher executive, Mr. Gould, had already signed a document stating that the pricing was subject to senior management approval.  Mr. Sabatine expressly admitted that he knew that the approval never came, and Mr. Sabatine viewed Mr. Stump as a subordinate to Mr. Gould.  Therefore, if Mr. Sabatine ordered an asphalt plant and placed bids based upon the actions of a person in a subordinate position to Mr. Gould, he did so at his own risk.

For the foregoing reasons, the Court finds that no genuine issue of material fact exist as to whether Defendant made a clear and unambiguous promise and whether Hardrive's reliance on such a promise was reasonable.  Accordingly, Plaintiff's promissory estoppel claim is dismissed in its entirety with prejudice.

Lastly, the Court notes that Plaintiff's promissory estoppel claim is also barred by the UCC statute of limitations.  Although Defendant has not raised the issue,  the Court will address it because Ohio law establishes that a promissory estoppel claim based upon a transaction in goods is governed by Article II of the UCC.  As the Ninth District Court of Appeals of Ohio stated:

> Radio Parts, Apsco, and Nimbus's second assignment of error is that the trial court incorrectly applied R.C. 1302.98 as the statute of limitations in this case because they did not plead any claims under the Uniform Commercial Code ("U.C.C.") or seek any U.C.C. remedies. They have argued that "[a]t worst, the contract claim would be dismissed, but the promissory estoppel, account and quasi contract claims would

continue." In response, Invacare has argued that the U.C.C. applies to all counts because this case involves merchants disputing claims relating to an alleged contract for the sale of goods.

In considering whether a cause of action is time-barred, courts must determine "the true nature or subject matter of the acts giving rise to the complaint." *Doe v. First United Methodist Church* (1994), 68 Ohio St.3d 531, 536, 629 N.E.2d 402. Courts must consider the "essential character" of a plaintiff's claim, rather than the form of the pleadings. *Id.*, quoting *Love v. Port Clinton* (1988), 37 Ohio St.3d 98, 524 N.E.2d 166, syllabus. The Ohio Supreme Court has held that the form of the pleading is "immaterial" to the determination of which statute of limitations applies. *Id.*, quoting *Hambleton v. R.G. Barry Corp.* (1984), 12 Ohio St.3d 179, 183, 12 OBR 246, 465 N.E.2d 1298. The party's creativity in pleading "cannot be allowed to mask or change the fundamental nature of [the] causes of action." *Id.* at 537, 629 N.E.2d 402.

Radio Parts, Apsco, and Nimbus alleged four causes of action in this case: breach of contract, unjust enrichment, promissory estoppel, and action on account. Each of the claims is based on the same allegation: Invacare failed to accept delivery and pay for items it had agreed to purchase from its long-time supplier. Regardless of the creativity in pleading, the fundamental nature of these claims is the same: breach of a sales contract. *See id.* at 536, 629 N.E.2d 402.

R.C. Chapter 1302 is Ohio's codification of the Uniform Commercial Code. According to R.C. 1302.02, the chapter applies to all "transactions in goods," except that it does not affect any statute regulating sales to "consumers, farmers, or other specified classes of buyers." The statute defines [g]oods as all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale. R.C. 1302.01(A)(8). The circuit-board assemblies and component parts fit this definition, and Radio Parts, Apsco, and Nimbus have not argued to the contrary. They also have not argued that Invacare falls into a statutory exception for certain classes of buyers. All parties to this alleged purchase agreement were merchants "who deal[ ] in [these] goods." R.C. 1302.01(A)(5). The essential character of the agreement that Radio Parts, Apsco, and Nimbus claim that they made with Invacare called for the purchase of certain goods. Therefore, regardless of the way they pleaded their claims, R.C. Chapter 1302 applies, and the second assignment of error is overruled.

*Radio Parts Co. v. Invacare Corp.*, 897 N.E.2d 228, at 233-35 (Ohio App. 9 Dist.,2008).

Although Defendant did not argue that Count II was time-barred, the Court finds that it is time-barred in light of the analysis and holding in *Radio Parts*. Plaintiff has already briefed the issue pertaining to whether the instant case is governed by the UCC, and the Court has decided that the underlying transaction was a transaction in goods. *See supra* § V(B)(vi). Further, Ohio law clearly dictates that the UCC would govern any promissory estoppel claim precipitating from the transaction. Therefore, the Court sees no reason not to dismiss Count II as time-barred in addition to dismissing the claim due to a lack of merit.

## VI.    CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is GRANTED.  ECF Dkt. #122.  Plaintiff's complaint is DISMISSED in its entirety WITH PREJUDICE.

IT IS SO ORDERED.


Date:  June 2, 2010                                      __/s/  *George J. Limbert*_____
                                                         GEORGE J. LIMBERT
                                                         UNITED STATES MAGISTRATE JUDGE